*PRELIMINARY PRINT*

VOLUME 602 U. S. PART 1

PAGES 821–898

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 21, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.  Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# ERLINGER *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SEVENTH CIRCUIT

No. 23–370.   Argued March 27, 2024—Decided June 21, 2024

Paul Erlinger pleaded guilty to being a felon in possession of a firearm in
violation of 18 U. S. C. § 922(g).   At sentencing, the judge found Mr. Er-
linger eligible for an enhanced sentence under the Armed Career Crimi-
nal Act, § 924(e)(1), which increases the penalty for a § 922(g) conviction
from a maximum sentence of 10 years to a mandatory minimum sentence
of 15 years when the defendant has three or more qualifying convictions
for offenses committed on different occasions.   Subsequently, the Sev-
enth Circuit held in unrelated decisions that two of the offenses on which
the government relied for Mr. Erlinger's sentence enhancement no
longer qualified as ACCA predicate offenses.   The District Court va-
cated Mr. Erlinger's sentence and scheduled resentencing.   At the re-
sentencing hearing, prosecutors again pursued an ACCA sentence en-
hancement based on a new set of 26-year-old convictions for burglaries
committed by Mr. Erlinger over the course of several days.   Mr. Er-
linger protested that the burglaries were part of a single criminal epi-
sode and did not occur on separate occasions, as required by ACCA.
Moreover, Mr. Erlinger argued that the question whether he committed
these prior burglaries during a single episode or on distinct occasions
required an assessment of the facts surrounding those offenses, and that
the Fifth and Sixth Amendments required that a jury make that assess-
ment.   The District Court rejected Mr. Erlinger's request for a jury
and issued a 15-year enhanced sentence.   On appeal, the government
confessed error.   Pointing to this Court's recent decision in *Wooden* v.
*United States*, 595 U. S. 360, which acknowledged that an ACCA "occa-
sions inquiry" can be intensely factual in nature, the government ad-
mitted that given the factual nature of the inquiry and its impact on a
defendant's sentence, the Constitution requires a jury to decide unani-
mously and beyond a reasonable doubt whether Mr. Erlinger's prior
offenses were committed on different occasions.   This Court granted
certiorari and appointed counsel to defend the judgment below.

*Held*: The Fifth and Sixth Amendments require a unanimous jury to make
the determination beyond a reasonable doubt that a defendant's past
offenses were committed on separate occasions for ACCA purposes.
Pp. 829–849.

(a) The Sixth Amendment promises that "[i]n all criminal prosecutions, the accused" has "the right to a speedy and public trial, by an impartial jury." Inherent in that guarantee is an assurance that any guilty verdict will issue only from a unanimous jury. *Ramos* v. *Louisiana*, 590 U. S. 83, 93. The Fifth Amendment further promises that the government may not deprive individuals of their liberty without "due process of law." It safeguards for criminal defendants well-established common-law protections, including the "ancient rule" that the government must prove to a jury every one of its charges beyond a reasonable doubt. Together, these Amendments place the jury at the heart of our criminal justice system and ensure a judge's power to punish is derived wholly from, and remains always controlled by, the jury and its verdict. *Blakely* v. *Washington*, 542 U. S. 296, 306.

The Court has repeatedly cautioned that trial and sentencing practices must remain within the guardrails provided by these two Amendments. Thus in *Apprendi* v. *New Jersey*, 530 U. S. 466, the Court held that a novel "sentencing enhancement" was unconstitutional because it violated the rule that only a jury may find "facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.*, at 490. This principle applies when a judge seeks to issue a sentence that exceeds the *maximum* penalty authorized by a jury's findings as well as when a judge seeks to increase a defendant's *minimum* punishment. See, *e. g.*, *Alleyne* v. *United States*, 570 U. S. 99, 111–113. Pp. 829–834.

(b) The government concedes what all of this means for Mr. Erlinger. To trigger ACCA's mandatory minimum, the government had to prove, among other things, that his three predicate convictions were "committed on occasions different from one another." § 924(e)(1). And as *Wooden* observed, deciding whether those past offenses occurred on three or more different occasions is a fact-laden task. As the government recognizes, virtually "any fact" that "increase[s] the prescribed range of penalties to which a criminal defendant is exposed" must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea). *Apprendi*, 530 U. S., at 490. Here, the sentencing court made a factual finding that Mr. Erlinger's offenses occurred on at least three separate occasions. And as in *Apprendi* and *Alleyne*, that factual finding had the effect of increasing *both* the maximum and minimum sentences Mr. Erlinger faced. Thus, Mr. Erlinger was entitled to have a jury resolve ACCA's occasions inquiry unanimously and beyond a reasonable doubt. This Court decides no more than that. Pp. 834–835.

(c) Court-appointed *amicus* cannot avoid this conclusion. Pp. 836–848.

Page Proof Pending Publication

(1) *Amicus* relies on an exception announced in *Almendarez-Torres* v. *United States*, 523 U. S. 224, which he argues permits a judge to find certain facts related to a defendant's past offenses, including whether he committed them on different occasions. That decision is an outlier. And the Court has described it as "at best an exceptional departure" from historic practice. *Apprendi*, 530 U. S., at 487. It persists as a "narrow exception" permitting judges to find only "the fact of a prior conviction." *Alleyne*, 570 U. S., at 111, n. 1. Pp. 836–839.

(2) *Amicus* responds that if *Almendarez-Torres* permits a judge to find the fact of a conviction, that necessarily implies that a judge may also find the jurisdiction in which the underlying offense occurred and the date it happened, which is generally enough to resolve the occasions inquiry, making sending it to a jury pointless. This Court disagrees. To answer such questions, a court will sometimes consult the *Shepard* documents in a case, which include judicial records, plea agreements, and colloquies between a judge and the defendant. See *Shepard* v. *United States*, 544 U. S. 13. This Court's cases hold that a sentencing judge may use the information gleaned from *Shepard* documents for the "limited function" of determining the fact of a prior conviction and the then-existing elements of that offense. "[N]o more is allowed." *Mathis* v. *United States*, 579 U. S. 500, 511. Moreover, often *Shepard* documents will not contain all the information needed to conduct a sensible ACCA occasions inquiry, and they can also be "prone to error." *Mathis*, 579 U. S., at 512. Pp. 839–842.

(3) *Amicus* insists this Court's *Almendarez-Torres* precedents are mistaken, because the Fifth and Sixth Amendments' original meaning and common-law traditions authorize judges at sentencing to find all manner of facts about an offender's past crimes. But this Court has been down this road many times before, and to reconsider all those precedents now would require, at the least, convincing proof indeed. See *United States* v. *Gaudin*, 515 U. S. 506, 515. Yet *amicus* offers nothing like that, and the evidence he does offer does more to hurt than help his cause. *Amicus* points to supplemental information procedures that a few States employed in the early 19th century. But a sentencing procedure followed by a few States hardly represents "convincing" proof that our precedents have mistaken the original meaning of the Fifth and Sixth Amendments. And in upholding one such scheme, the Court stressed that, under the law's terms, even "the fact of former conviction" had to be "charged" by prosecutors and then "determined by a jury in a proceeding thereby instituted." *Graham* v. *West Virginia*, 224 U. S. 616, 630. *Amicus* next turns to the Double Jeopardy Clause, which permits a judge to look into a defendant's past conduct to ask whether the government has charged a defendant for the same crime a

second time. While the Double Jeopardy Clause protects a defendant by prohibiting a judge from even empaneling a jury when the defendant has already faced trial on the charged crime, the Fifth and Sixth Amendments' jury trial rights provide a defendant with entirely complementary protections at a different stage of the proceedings by ensuring that, once a jury is lawfully empaneled, the government must prove beyond a reasonable doubt to a unanimous jury the facts necessary to sustain the punishment it seeks. Finally, *amicus* points to case law and statutes in four other States. But while this evidence may suggest that in a small number of jurisdictions, judges could find the existence, number, and dates of a defendant's prior convictions, none of this provides a persuasive basis for revisiting this Court's many precedents forbidding judges from doing more, let alone prove a longstanding tradition. Pp. 843–847.

(4) *Amicus* argues that leaving the occasions inquiry to juries would do more to prejudice than to protect defendants. That concern, like arguments about efficiency, cannot alter the demands of the Fifth and Sixth Amendments. Tools such as bifurcation in any event exist to address the prejudicial effect evidence about a defendant's past crimes can have on a jury. Pp. 847–848.

77 F. 4th 617, vacated and remanded.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, SOTOMAYOR, KAGAN, and BARRETT, JJ., joined. ROBERTS, C. J., *post*, p. 849, and THOMAS, J., *post*, p. 850, filed concurring opinions. KAVANAUGH, J., filed a dissenting opinion, in which ALITO, J., joined, and in which JACKSON, J., joined except as to Part III, *post*, at 851. JACKSON, J., filed a dissenting opinion, *post*, p. 871.

*Jeffrey L. Fisher* argued the cause for petitioner. With him on the briefs were *Rachel A. Chung, Jessie A. Cook, Heather Welles*, and *Louis W. Fisher*.

*Deputy Solicitor General Feigin* argued the cause for the United States in support of petitioner. With him on the briefs were *Solicitor General Prelogar, Acting Assistant Attorney General Argentieri, Yaira Dubin*, and *Paul T. Crane*.

*D. Nick Harper*, by invitation of the Court, 601 U. S. ——, argued the cause and filed a brief as *amicus curiae* in support of the judgment below. With him on the brief were

*Miguel A. Estrada, Jonathan C. Bond,* and *Robert A. Batista.**

JUSTICE GORSUCH delivered the opinion of the Court.

This case concerns the Armed Career Criminal Act (ACCA) and the Fifth and Sixth Amendments. ACCA imposes lengthy mandatory prison terms on certain defendants who have previously committed three violent felonies or serious drug offenses on separate occasions. The question we face is whether a judge may decide that a defendant's past offenses were committed on separate occasions under a preponderance-of-the-evidence standard, or whether the Fifth and Sixth Amendments require a unanimous jury to make that determination beyond a reasonable doubt.

I

In 2017, the federal government charged Paul Erlinger under 18 U. S. C. § 922(g) with being a felon unlawfully in possession of a firearm. At the time, a conviction for that offense ordinarily carried a sentence of up to 10 years in prison. § 924(a)(2) (2012 ed.). But the government also charged Mr. Erlinger under ACCA. And under that statute, a defendant found guilty of violating § 922(g) can face even more severe punishment. Specifically, if the defendant has three prior convictions for "violent felon[ies]" or "serious drug offense[s]" that were "committed on occasions different from one another," ACCA increases the prison term he faces to a minimum of 15 years and a maximum of life. § 924(e)(1) (2012 ed.).

---

*Briefs of *amici curiae* urging reversal were filed for FAMM by *Amy Mason Saharia, Mary Price,* and *Peter Goldberger*; for the National Association of Criminal Defense Lawyers by *Peter B. Siegal, Jeffrey T. Green,* and *David Oscar Markus*; and for the National Association of Federal Defenders by *Davina T. Chen, Shelley M. Fite, Michael C. Holley, Andrew L. Adler, Jennifer Niles Coffin,* and *Judy Madewell.*

Mr. Erlinger pleaded guilty to violating § 922(g). But in doing so, he stressed that his previous convictions were more than a decade old and since then he had turned his life around, secured a steady job, built a family, and remained free from drugs. Tr. of Plea and Sentencing Hearing in No. 2:18–cr–00013 (SD Ind., Oct. 24, 2018), ECF Doc. 67, p. 24. In light of these facts, the sentencing judge stated that a 5-year prison term would represent a "fair sentence." *Id.*, at 30. But the judge also found it more likely than not that Mr. Erlinger's past included three ACCA-qualifying offenses committed on three different occasions. *Id.*, at 17. And based on that finding, the court concluded, it had no authority to issue a 5-year sentence. *Id.*, at 29–30. Instead, ACCA required a sentence of at least 15 years. That was "too high" for Mr. Erlinger's crime, the court emphasized, but it had "no power" to order anything less. *Ibid.*

Shortly after the court issued a 15-year sentence consistent with ACCA, the ground shifted. The Seventh Circuit issued decisions indicating that two of the three offenses on which the district court had relied to invoke ACCA did not qualify as "violent felon[ies]" or "serious drug offense[s]." 77 F. 4th 617, 619 (2023) (citing *United States* v. *Glispie*, 978 F. 3d 502 (2020), and *United States* v. *De La Torre*, 940 F. 3d 938 (2019)). That left Mr. Erlinger with only one qualifying prior conviction, not the three ACCA requires. Recognizing as much, the district court vacated its sentence and set the case for a new sentencing hearing. Order, ECF Doc. 81.

There, prosecutors once more pursued a 15-year ACCA sentence. This time, though, they pointed to a new set of prior convictions arising from burglaries Mr. Erlinger committed when he was 18 years old—some 26 years before his § 922(g) charge. Tr. of Video Resentencing Hearing, ECF Doc. 120, at 37–38. As the government told it, within a span of days Mr. Erlinger burglarized a pizza shop, a sporting goods store, and two restaurants. *Ibid.* Because each of

these burglaries occurred on different occasions, the government submitted, each could serve as an ACCA predicate and collectively they could support an ACCA sentence. *Id.*, at 39–40.

Mr. Erlinger protested. He maintained that his decades-old burglaries had not occurred on four separate occasions but during a single criminal episode, all of which meant he still lacked the three prior offenses ACCA requires. *Id.*, at 20. More than that, Mr. Erlinger argued, the question whether he committed his prior burglaries during a single episode or on distinct occasions required an assessment of the facts surrounding those offenses. *Id.*, at 22–23. And, he contended, the Fifth and Sixth Amendments entitled him to have a jury make that assessment. *Id.*, at 23.

The district court rejected Mr. Erlinger's request for a jury. It proceeded to find for itself that each of his 26-year-old burglaries occurred on distinct occasions. *Id.*, at 48–49. Armed with this finding, the court held that Mr. Erlinger had at least three previous ACCA-qualifying offenses and once more issued a 15-year sentence. Again, the court said that it thought the result "unfortunate" and "excessive." *Id.*, at 50. But, again, it said ACCA left it no choice. *Id.*, at 50–51.

On appeal, Mr. Erlinger renewed his argument that the Fifth and Sixth Amendments entitled him to have a jury decide whether his burglaries occurred on different occasions. But this time, the government confessed error. The Constitution, it said, "requires a jury" to decide unanimously and beyond a reasonable doubt whether Mr. Erlinger's ACCA predicates were "'committed on occasions different from one another.'" 77 F. 4th, at 619, 620.

In explaining its turnabout, the government pointed to this Court's recent decision in *Wooden* v. *United States*, 595 U. S. 360 (2022). That decision did not directly address whether a judge may, or a jury must, resolve disputes about

whether multiple crimes occurred on multiple occasions. *Id.*, at 365, n. 3; see *id.*, at 397, n. 7 (GORSUCH, J., concurring in judgment). But, the government acknowledged, *Wooden* did hold that ACCA's occasions "inquiry" can require an examination of a "range" of facts, including whether the defendant's past offenses were "committed close in time," whether they were committed near to or far from one another, and whether the offenses were "similar or intertwined" in purpose and character. *Id.*, at 369. And given the intensely factual nature of this inquiry and the impact its resolution can have on a defendant's sentence, the government admitted, a jury must resolve it. That conclusion, the government represented, flows directly from this Court's consistent holdings that the Fifth and Sixth Amendments generally guarantee a defendant the right to have a unanimous jury find beyond a reasonable doubt any fact that increases his exposure to punishment. Brief for United States in No. 22–1926 (CA7), pp. 9–11.

Despite the government's concession, the Seventh Circuit refused to disturb the district court's sentence. 77 F. 4th, at 621–622. That left Mr. Erlinger to petition this Court for certiorari. The government filed a brief in support of his petition. In it, the government argued that a number of courts of appeals have refused requests for juries in cases like Mr. Erlinger's and that "this Court's intervention is necessary to ensure that the circuits correctly recognize defendants' constitutional rights in this context." Brief for United States on Pet. for Cert. 5–6.

We agreed to take up Mr. Erlinger's case to decide whether ACCA's occasions inquiry must be resolved by a jury. 601 U. S. —— (2023). Because the government now agrees with Mr. Erlinger about the proper resolution of that question, we appointed Nick Harper to defend the judgment below as *amicus curiae.* 601 U. S. —— (2023). He has ably discharged his responsibilities.

## II

### A

Prominent among the reasons colonists cited in the Declaration of Independence for their break with Great Britain was the fact Parliament and the Crown had "depriv[ed] [them] in many cases, of the benefits of Trial by Jury." ¶20. For centuries, English law had recognized the right to trial by jury. *Duncan* v. *Louisiana*, 391 U. S. 145, 151 (1968). Yet, as tensions grew between the British Empire and its American Colonies, imperial authorities responded by stripping away that ancient right. By their lights, colonial juries "'were not to be trusted'" because they found for defendants too often. D. Lovejoy, Rights Imply Equality: The Case Against Admiralty Jurisdiction in America, 1764–1776, 16 Wm. & Mary Q. 459, 468 (1959). To secure more vigorous enforcement of the Stamp Act and other unpopular laws, authorities directed more and more cases to vice-admiralty courts where crown-appointed judges, rather than local juries, decided the defendant's fate. *Jones* v. *United States*, 526 U. S. 227, 245–246 (1999). Just as authorities hoped, the tactic proved "'most effective'" at securing the verdicts they wished. *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 340, n. 3 (1979) (Rehnquist, J., dissenting) (quoting 11 W. Holdsworth, A History of English Law 110 (1966)).

After securing their independence, the founding generation sought to ensure what happened before would not happen again. As John Adams put it, the founders saw representative government and trial by jury as "the heart and lungs" of liberty. Letter from Clarendon to W. Pym (Jan. 27, 1766), in 1 Papers of John Adams 169 (R. Taylor ed. 1977). "[W]ithout them," he wrote, we "have no other fortification . . . against being ridden like horses, fleeced like sheep, worked like cattle, and fed and clothed like swine and hounds." *Ibid.* Reflecting that sentiment, the right to trial

by jury in criminal cases was, on one telling, the only right included in every newly enacted state constitution. A. Alschuler & A. Deiss, A Brief History of the Criminal Jury in the United States, 61 U. Chi. L. Rev. 867, 870 (1994).

Those who drafted our Federal Constitution took just as strong a stand on the jury trial right. As originally proposed, the Constitution promised that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." Art. III, §2, cl. 3. In the ratification debates that followed, some questioned the adequacy of this provision; even with it, they feared, the new federal government might fall prey to the kinds of temptations that led the British to restrict the jury trial right in the colonies. That right, they argued, had to be "guard[ed] with the most jealous circumspection." A [New Hampshire] Farmer, No. 3, June 6, 1788, quoted in The Complete Bill of Rights 681 (N. Cogan 2d ed. 2015) (internal quotation marks and italics omitted). To address this and other concerns about the new Constitution, James Madison agreed to draft a series of amendments we now know as the Bill of Rights. No fewer than three of those ten amendments touch on the right to trial by jury, two with implications for criminal cases. Amdts. 5, 6, 7. Madison himself described protections for the jury trial right as among "the most valuable" that appear in "the whole list" of amendments he produced. 1 Annals of Cong. 755 (1789).

The Sixth Amendment promises that "[i]n all criminal prosecutions, the accused" has "the right to a speedy and public trial, by an impartial jury." Inhering in that guarantee is an assurance that a guilty verdict will issue only from a unanimous jury. *Ramos* v. *Louisiana*, 590 U. S. 83, 93 (2020). The Fifth Amendment further promises that the government may not deprive individuals of their liberty without "due process of law." It is a promise that safeguards for criminal defendants those procedural protections well established at common law, including the "ancient rule" that the government must prove to a jury every one of its

charges beyond a reasonable doubt. *United States* v. *Haymond*, 588 U. S. 634, 641 (2019) (plurality opinion); see *Apprendi* v. *New Jersey*, 530 U. S. 466, 477–478 (2000); *United States* v. *Gaudin*, 515 U. S. 506, 510 (1995); *Sullivan* v. *Louisiana*, 508 U. S. 275, 277–278 (1993).

The Fifth and Sixth Amendments placed the jury at the heart of our criminal justice system. From the start, those provisions were understood to require the government to include in its criminal charges "'all the facts and circumstances which constitute the offence.'" *Apprendi*, 530 U. S., at 478 (quoting J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862)). Should an "indictment or 'accusation . . . lack any particular fact which the laws ma[d]e essential to the punishment,' it was treated as 'no accusation' at all." *Haymond*, 588 U. S., at 642 (quoting 1 J. Bishop, Criminal Procedure §87, p. 55 (2d ed. 1872) (some alterations omitted)). And at all times the "'truth of every accusation'" against a defendant had to be "'confirmed by the unanimous suffrage of twelve of [his] equals and neighbours.'" *Apprendi*, 530 U. S., at 477 (quoting 4 W. Blackstone, Commentaries on the Laws of England 343 (1769); emphasis deleted).

Equally, the Fifth and Sixth Amendments sought to ensure that a judge's power to punish would "deriv[e] wholly" from, and remain always "control[led]" by, the jury and its verdict. *Blakely* v. *Washington*, 542 U. S. 296, 306 (2004). Ordinarily, common-law crimes carried "specific sanctions, and '[o]nce the facts of the offense were determined by the jury, the judge was meant simply to impose the prescribed sentence.'" *Haymond*, 588 U. S., at 642 (quoting *Alleyne* v. *United States*, 570 U. S. 99, 108 (2013) (plurality opinion)). Even when it came to early American statutes that gave judges a measure of discretion in selecting among possible sentences, "the ranges themselves were linked to particular facts" found by the jury. *Alleyne*, 570 U. S., at 109 (collecting examples). All of which guaranteed that a judge could

not "'swell the penalty above what the law . . . provided for the acts'" found by a jury of the defendant's peers. *Haymond*, 588 U. S., at 642 (quoting *Apprendi*, 530 U. S., at 519 (THOMAS, J., concurring)).

These principles represent not "procedural formalit[ies]" but "fundamental reservation[s] of power" to the American people. *Blakely*, 542 U. S., at 305–306. By requiring the Executive Branch to prove its charges to a unanimous jury beyond a reasonable doubt, the Fifth and Sixth Amendments seek to mitigate the risk of prosecutorial overreach and misconduct, including the pursuit of "pretended offenses" and "arbitrary convictions." The Federalist No. 83, p. 499 (C. Rossiter ed. 1961); accord, Federal Farmer, Letter XV (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 320 (H. Storing ed. 1981). By requiring a unanimous jury to find every fact essential to an offender's punishment, those amendments similarly seek to constrain the Judicial Branch, ensuring that the punishments courts issue are not the result of a judicial "inquisition" but are premised on laws adopted by the people's elected representatives and facts found by members of the community. *Blakely*, 542 U. S., at 307; *Haymond*, 588 U. S., at 640–641. Both of these checks on governmental power, the framers appreciated, were "anchor[s]" essential to prevent a slide back toward regimes like the vice-admiralty courts they so despised. Letter from T. Jefferson to T. Paine (July 11, 1789), reprinted in 15 Papers of Thomas Jefferson 266, 269 (J. Boyd ed. 1958).

With the passage of time, and accelerating in earnest in the 20th century, various governments in this country sought to experiment with new trial and sentencing practices. See *Mistretta* v. *United States*, 488 U. S. 361, 363–367 (1989); *Williams* v. *New York*, 337 U. S. 241, 247–248 (1949); see also P. Tappan, Sentencing Under the Model Penal Code, 23 Law & Contemp. Prob. 528, 529–532 (1958). But in case after case, this Court has cautioned that, while some experiments may be tolerable, all must remain within the Fifth and Sixth Amendments' guardrails.

So, for example, in *Apprendi* this Court faced a case involving a New Jersey offense that ordinarily carried a maximum sentence of 10 years in prison. 530 U. S., at 468. The State, however, had adopted a novel "sentencing enhancement" that purported to allow a judge to impose an even longer term of imprisonment after finding, by a preponderance of the evidence, that the offender's crime was motivated by racial bias. *Id.*, at 468–471. Relying on that statutory authority, the sentencing judge ordered the defendant to serve 12 years in prison. *Id.*, at 471. This Court found the sentence unconstitutional, and did so for a by-now familiar reason: Only a jury may find " 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed.' " *Id.*, at 490.

It is a principle we have since reiterated in response to a variety of other recent sentencing innovations. See *Haymond*, 588 U. S., at 644 (collecting cases). And it is a principle, we have observed, that does not just apply when a judge seeks to issue a sentence that exceeds the *maximum* penalty authorized by a jury's findings (or a guilty plea). It is a principle that also applies when a judge seeks to increase a defendant's *minimum* punishment. *Alleyne* illustrates the point. There, we confronted a case in which a jury had convicted the defendant of a crime that usually carried a sentence of between five years and life in prison. 570 U. S., at 103–104. But a separate statutory "sentencing enhancement" ostensibly allowed the judge to transform that 5-year minimum sentence into a 7-year minimum sentence if he found a certain additional fact by a preponderance of the evidence. *Ibid.* That innovation, too, the Court held, improperly invaded the jury's province because "[a] fact that increases" a defendant's exposure to punishment, whether by triggering a higher maximum *or* minimum sentence, must "be submitted to a jury" and found unanimously and beyond a reasonable doubt. *Id.*, at 111–113.

The principles *Apprendi* and *Alleyne* discussed are so firmly entrenched that we have now overruled several deci-

sions inconsistent with them. See, *e. g., Hurst* v. *Florida,*
577 U. S. 92, 101–102 (2016) (overruling *Hildwin* v. *Florida,*
490 U. S. 638 (1989) (*per curiam*), and *Spaziano* v. *Florida,*
468 U. S. 447 (1984)); *Alleyne,* 570 U. S., at 107 (overruling
*Harris* v. *United States,* 536 U. S. 545 (2002)); *Ring* v. *Arizona,* 536 U. S. 584, 609 (2002) (overruling *Walton* v. *Arizona,* 497 U. S. 639 (1990)).

B

Commendably, the government concedes before us, as it
did before the court of appeals, what all this means for
Mr. Erlinger's case and others like it. Under § 922(g),
Mr. Erlinger faced between 0 and 10 years in prison.
§ 924(a)(2) (2012 ed.). To trigger ACCA and expose him to
longer prison terms, the government had to prove that his
past included three convictions for "violent felon[ies]" or "serious drug offense[s]" that were "committed on occasions different from one another." § 924(e)(1). And under *Wooden,*
deciding whether those past offenses occurred on three or
more different occasions is a fact-laden task. Were the
crimes "committed close in time"? 595 U. S., at 369. How
about the "[p]roximity" of their "location[s]"? *Ibid.* Were
the offenses "similar or intertwined" in purpose and character? *Ibid.* All these questions, *Wooden* observed, "may be
relevant" to determining whether the offenses were committed on one occasion or separate ones—and all require
facts to be found before ACCA's more punitive mandatory
minimum sentence may be lawfully deployed. *Ibid.*

As the government recognizes, there is no doubt what the
Constitution requires in these circumstances: Virtually "any
fact" that "'increase[s] the prescribed range of penalties to
which a criminal defendant is exposed'" must be resolved by
a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea). *Apprendi,* 530 U. S., at 490; see
Brief for United States 9. Judges may not assume the jury's
factfinding function for themselves, let alone purport to perform it using a mere preponderance-of-the-evidence standard. To hold otherwise might not portend a revival of the

vice-admiralty courts the framers so feared. See Part II–A, *supra*. But all the same, it would intrude on a power the Fifth and Sixth Amendments reserve to the American people.

Really, this case is as nearly on all fours with *Apprendi* and *Alleyne* as any we might imagine. In *Apprendi*, a judge relied on his own factual findings under a preponderance-of-the-evidence standard to increase the defendant's maximum sentence from 10 to 20 years. 530 U. S., at 469. In *Alleyne*, a judge proceeded the same way to increase the defendant's minimum sentence from five to seven years. 570 U. S., at 104. Here, the sentencing court's factual finding that Mr. Erlinger's offenses occurred on at least three separate occasions had the effect of increasing *both* the maximum and minimum sentences he faced. Rather than a maximum sentence of 10 years in prison, the judge's finding left Mr. Erlinger exposed to life in prison. Rather than a minimum penalty of no prison time, the judge's finding meant Mr. Erlinger had to serve at least 15 years.

While recognizing Mr. Erlinger was entitled to have a jury resolve ACCA's occasions inquiry unanimously and beyond a reasonable doubt, we decide no more than that. For purposes of the proceedings before us, the parties take as given that Mr. Erlinger committed four burglaries and that each qualifies as a "violent offense" under ACCA. But they disagree vigorously about whether those burglaries took place on at least three different occasions (so that ACCA's enhanced sentences would apply) or during a single criminal episode (so that they would not). Presented with evidence about the times, locations, purpose, and character of those crimes, a jury might have concluded that some or all occurred on different occasions. Or it might not have done so. All we can say for certain is that the sentencing court erred in taking that decision from a jury of Mr. Erlinger's peers.[1]

---

[1] JUSTICE JACKSON pursues an argument neither the government nor *amicus* nor the principal dissent attempts. She says *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), "was wrongly decided," and all but calls on

## III

### A

The Court-appointed *amicus* resists the conclusion we reach. Unlike JUSTICE JACKSON, see n. 1, *supra*, however, *amicus* does not dispute the Constitution's time-honored guarantee that a unanimous jury ordinarily must find beyond a reasonable doubt any fact that increases a defendant's exposure to punishment. See Brief for Court-Appointed *Ami*-

---

the Court to overturn our many precedents applying it, *post*, at 872, and n. 1, 880–889. But rather than meaningfully engage with the Constitution, its original meaning and history, or our precedents, JUSTICE JACKSON would abandon "constitutional theory" and appeal to a different authority. *Post*, at 897. "In my view," *post*, at 890, JUSTICE JACKSON contends, juries cannot "deal with the fine-grained, nuanced determinations . . . that are necessary to fairly adjudicate factual questions like the one that ACCA's occasions inquiry raises," *post*, at 893. But the Constitution does not take such a dim view about the capacity of jurors or the rigors of trial. Surely, too, juries are no less capable than judges to decide whether three past events happened on three separate occasions. Day in and day out, using everyday trial procedures, juries decide exponentially more complex questions than that. Nor, of course, does *Apprendi* prohibit legislatures from enacting reforms authorizing judges to *lower* sentences based on their own factfinding. See, *e. g.*, First Step Act of 2018, Pub. L. 115–391, 132 Stat. 5194; 18 U. S. C. § 3553(f) (doing just that). The only thing judges may not do consistent with *Apprendi* is *increase* a defendant's exposure to punishment based on their own factfinding. All of which leaves JUSTICE JACKSON with her real complaint: In her view, it is "wildly inefficient" to require the government to call witnesses and present evidence— which is to say prove its case—when a judge might more easily enhance a defendant's exposure to punishment by consulting "sometimes-decades-old," *post*, at 893, and error-prone court records, *infra*, at 840–842. But does JUSTICE JACKSON really think it too much to ask the government to prove its case (as it concedes it must) with reliable evidence before seeking enhanced punishments under a statute like ACCA when the "practical realit[y]" for defendants like Mr. Erlinger is exposure to an additional decade (or more) in prison? *Post*, at 897. JUSTICE JACKSON may view juries as "roadblocks" to higher punishments. *Post*, at 889. But "[t]he bottom line is this": the people ratified the Fifth and Sixth Amendments, not any of our personal views. *Post*, at 897.

*cus Curiae* 1. In defending the decision below, *amicus* relies instead on an exception to that rule this Court announced in *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998). On *amicus*'s telling, that exception permits a judge to find perhaps any fact related to a defendant's past offenses, including whether he committed them on different occasions. Brief for Court-Appointed *Amicus Curiae* 10. The principal dissent presses the same line of argument. *Post*, at 855 (opinion of KAVANAUGH, J.).

We disagree. In *Almendarez-Torres*, the Court considered sentencing laws applicable to aliens who returned to the United States after a previous removal. The default sentencing range was up to two years of imprisonment. 8 U. S. C. § 1326(a) (1994 ed.). But a finding that the government previously removed the alien after a "conviction for commission of an aggravated felony" triggered a new maximum penalty of up to 20 years in prison. § 1326(b) (1994 ed.). In *Almendarez-Torres*, the Court permitted a judge to undertake the job of finding the fact of a prior conviction—and that job alone. 523 U. S., at 246–247.

Almost immediately, too, the decision came under scrutiny. *Jones*, 526 U. S., at 249, n. 10. The Court has since described *Almendarez-Torres* as "at best an exceptional departure" from "historic practice." *Apprendi*, 530 U. S., at 487. That decision, we have said, parted ways from the "uniform course of decision during the entire history of our jurisprudence." *Id.*, at 490. It was "arguabl[y] . . . incorrec[t]." *Id.*, at 489. And it amounted to an "unusual . . . exception to the Sixth Amendment rule in criminal cases that 'any fact that increases the penalty for a crime' must be proved to a jury." *Pereida* v. *Wilkinson*, 592 U. S. 224, 238 (2021) (quoting *Apprendi*, 530 U. S., at 490).

In separate opinions, a number of Justices have criticized *Almendarez-Torres* further yet, and JUSTICE THOMAS, whose vote was essential to the majority in that case, has called for it to be overruled. See, *e. g.*, *Mathis* v. *United*

*States*, 579 U. S. 500, 522 (2016) (THOMAS, J., concurring); *Descamps* v. *United States*, 570 U. S. 254, 280 (2013) (THOMAS, J., concurring in judgment); *Shepard* v. *United States*, 544 U. S. 13, 27 (2005) (THOMAS, J., concurring in part and concurring in judgment); see also *Jones*, 526 U. S., at 252–253 (Stevens, J., concurring); *Monge* v. *California*, 524 U. S. 721, 741 (1998) (Scalia, J., joined by Souter and Ginsburg, JJ., dissenting).

Still, no one in this case has asked us to revisit *Almendarez-Torres*. Nor is there need to do so today. In the years since that decision, this Court has expressly delimited its reach. It persists as a "narrow exception" permitting judges to find only "the fact of a prior conviction." *Alleyne*, 570 U. S., at 111, n. 1. Under that exception, a judge may "do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of." *Mathis*, 579 U. S., at 511–512. We have reiterated this limit on the scope of *Almendarez-Torres* "over and over," to the point of "downright tedium." 579 U. S., at 510, 519.[2] And so understood, *Almendarez-Torres* does nothing to save the sentence in this case. To determine whether Mr. Erlinger's prior convictions triggered ACCA's enhanced penalties, the district court had to do more than identify his previous convictions and the legal elements required to sustain them. It had to find that those offenses

_____

[2] See *Pereida* v. *Wilkinson*, 592 U. S. 224, 238 (2021); *United States* v. *Haymond*, 588 U. S. 634, 644, n. 3 (2019) (plurality opinion); *Descamps* v. *United States*, 570 U. S. 254, 269 (2013); *Cunningham* v. *California*, 549 U. S. 270, 282 (2007); *Shepard* v. *United States*, 544 U. S. 13, 24 (2005) (plurality opinion); *United States* v. *Booker,* 543 U. S. 220, 244 (2005); *Blakely* v. *Washington*, 542 U. S. 296, 301 (2004); *Apprendi* v. *New Jersey,* 530 U. S. 466, 490 (2000). The principal dissent complains that some of these decisions "did not involve recidivism" questions. *Post*, at 857 (opinion of KAVANAUGH, J.). But surely our consistent explanations of *Almendarez-Torres*'s reach cannot be so casually dismissed. Perhaps especially when those explanations were repeated in multiple cases that *did* "involve recidivism," such as *Shepard*, *Descamps*, and *Mathis*.

occurred on at least three separate occasions.   And, in doing so, the court did more than *Almendarez-Torres* allows.

### B

Perhaps, *amicus* replies, but perhaps not.   If *Almendarez-Torres* permits a judge to find "what crime, with what elements, the defendant was convicted of," *Mathis*, 579 U. S., at 511–512, *amicus* reasons, that necessarily implies a judge may also find the jurisdiction in which the underlying offense occurred and the date it happened.   Brief for Court-Appointed *Amicus Curiae* 29.   And, *amicus* continues, in at least some (but admittedly not all) cases, knowing those facts will make the occasions inquiry so "'straightforward'" that sending it to a jury would be pointlessly inefficient.   *Id.*, at 39–40.

Again, we disagree.   To conduct the narrow inquiry *Almendarez-Torres* authorizes, a court may need to know the jurisdiction in which the defendant's crime occurred and its date in order to ascertain what legal elements the government had to prove to secure a conviction in that place at that time.   And to answer those questions, a sentencing court may sometimes consult "a restricted set of materials," often called *Shepard* documents, that include judicial records, plea agreements, and colloquies between a judge and the defendant.   *Descamps*, 570 U. S., at 262; see *Shepard*, 544 U. S., at 20–21, 26; *Taylor* v. *United States*, 495 U. S. 575, 602 (1990).

None of that, however, means that a court may use *Shepard* documents or any other materials for any other purpose.  To ensure compliance with the Fifth and Sixth Amendments, a sentencing judge may use the information he gleans from *Shepard* documents for the "limited function" of determining the fact of a prior conviction and the then-existing elements of that offense.   *Descamps*, 570 U. S., at 260.   "[N]o more" is allowed.   *Mathis*, 579 U. S., at 511.   In particular, a judge may not use information in *Shepard* documents to decide "what the defendant . . . actually d[id]," or the "means" or

"manner" in which he committed his offense in order to increase the punishment to which he might be exposed. 579 U. S., at 504, 510–511; see *Descamps*, 570 U. S., at 269. To sanction that practice would be to allow a sentencing court to do exactly what the Fifth and Sixth Amendments forbid. *Ibid.*

The sentencing court in this case disregarded these constraints. To determine what legal elements attached to Mr. Erlinger's decades-old offenses, the court might have needed to consult *Shepard* documents to ascertain the jurisdiction in which they occurred and the date on which they happened. But the court had no need or authority "to go any further," *Mathis*, 579 U. S., at 511, and assume for itself the responsibility of deciding whether Mr. Erlinger's past offenses differed enough in time, location, character, and purpose to have transpired on different occasions. Let alone undertake that inquiry all with an eye toward increasing his punishment. The Fifth and Sixth Amendments "contemplat[e] that a jury—not a sentencing court—will find such facts, unanimously and beyond a reasonable doubt." *Descamps*, 570 U. S., at 269.[3]

Other considerations fortify our conclusion. Often, as *amicus* concedes, *Shepard* documents will not contain all the information needed to conduct a sensible ACCA occasions inquiry, such as the exact times and locations of the defendant's past crimes. Brief for Court-Appointed *Amicus Cu-*

---

[3] The principal dissent dismisses our precedents restricting the materials and facts judges can consider on the ground that those decisions did not "purpor[t] to articulate any Sixth Amendment holding." *Post*, at 858 (opinion of KAVANAUGH, J.). But, as the government recognizes, this Court did address the Sixth Amendment and "meant what it said." See Reply Brief for United States 7. As the Court has said before and we hold again today: "[A] judge cannot go beyond identifying the crime of conviction to explore the manner in which the defendant committed that offense. . . . He can do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of." *Mathis* v. *United States*, 579 U. S. 500, 511–512 (2016).

*riae* 40. Even when *Shepard* documents do contain that
kind of granular information, more still may be required.
After all, this Court has held that no particular lapse of time
or distance between offenses automatically separates a sin-
gle occasion from distinct ones. *Wooden*, 595 U. S., at 369–
370. Often, a qualitative assessment about "the character
and relationship" of the offenses may be required. *Id.*, at
369. So may an inquiry into whether the crimes shared "a
common scheme or purpose." *Ibid.*

Not only are *Shepard* documents of limited utility, they
can be "prone to error." *Mathis*, 579 U. S., at 512; see also
Brief for National Association of Federal Defenders as *Ami-
cus Curiae* 8–15 (NAFD Brief) (recounting examples of ma-
terial errors); *post*, at 895 (opinion of JACKSON, J.) (acknowl-
edging records are "imperfect" and may contain "material
gaps"). The risk of error may be especially grave when it
comes to facts recounted in *Shepard* documents on which
adversarial testing was "unnecessary" in the prior proceed-
ing. *Mathis*, 579 U. S., at 512. As we have recognized, "[a]t
trial, and still more at plea hearings, a defendant may have
no incentive to contest what does not matter" to his convic-
tion at the time. *Ibid.* He may even "'have good reason
not to'" haggle over seemingly immaterial errors in his judi-
cial records. *Ibid.* (quoting *Descamps*, 570 U. S., at 270).

Those realities counsel caution in the use of *Shepard* docu-
ments. At the time of his prior conviction, a defendant
might not have cared if a judicial record contained a mistake
about, say, the time or location of his offense. Back then,
fine details like those might not have mattered a bit to his
guilt or innocence. Contesting them needlessly, too, might
have risked squandering the patience and good will of a jury
or the judge responsible for pronouncing a sentence. Yet,
years later and faced with an ACCA charge, those kinds of
details can carry with them life-altering consequences. For
Mr. Erlinger, they may mean perhaps 10 more years in
prison. As a matter of fair notice alone, old recorded de-

tails, prone to error, sometimes untested, often inessential, and the consequences of which a defendant may not have appreciated at the time, "should not come back to haunt [him] many years down the road by triggering a lengthy mandatory sentence." 579 U. S., at 512; see also *Jones*, 526 U. S., at 249.

We do not question *amicus*'s assessment that in many cases the occasions inquiry will be " 'straightforward.' " Brief for Court-Appointed *Amicus Curiae* 39. Often, a defendant's past offenses will be different enough and separated by enough time and space that there is little question he committed them on separate occasions. But none of that means a judge rather than a jury should make the call. There is no efficiency exception to the Fifth and Sixth Amendments. In a free society respectful of the individual, a criminal defendant enjoys the right to hold the government to the burden of proving its case beyond a reasonable doubt to a unanimous jury of his peers " 'regardless of how overwhelmin[g]' " the evidence may seem to a judge. *Rose* v. *Clark*, 478 U. S. 570, 578 (1986).[4]

---

[4] The principal dissent stresses that, despite our repeated admonitions about the limitations associated with the use of *Shepard* materials, "all 12 Courts of Appeals" have permitted judges to use them to resolve the occasions inquiry. *Post*, at 856 (opinion of KAVANAUGH, J.). But most of the decisions the dissent cites issued before *Wooden*'s clarification about the nature of the occasions inquiry, a clarification even the government now recognizes means a jury is required. And to the extent some lower courts have continued to allow judges to resolve occasions inquiries even after *Wooden* v. *United States*, 595 U. S. 360 (2022), it seems confusion about *Almendarez-Torres* has played a role in their misapprehension about what the Constitution requires. See, *e. g.*, *United States* v. *Stowell*, 82 F. 4th 607, 611 (CA8 2023) (en banc) (Erickson, J., dissenting) (criticizing the majority for treating as "a foregone conclusion" that a judge may continue to find facts not proved to the jury to decide the occasions inquiry); *United States* v. *Brown*, 77 F. 4th 301, 301–302 (CA4 2023) (statement of Heytens, J.) (noting the "uncertain scope of *Almendarez-Torres*"); *id.*, at 302 (Niemeyer, J., concurring in part) (conceding "different approach[es]" exist "as to the scope of *Almendarez-Torre[s]*"); *id.*, at 303 (Wynn, J., dissenting

C

*Amicus* next asks us to turn from doctrine to history. While our precedents have consistently read *Almendarez-Torres* as permitting a judge to find only the fact of a prior conviction and the elements required to sustain it, he insists our precedents are mistaken. Properly understood, he submits, the Fifth and Sixth Amendments' original meaning and "deep" common-law traditions authorize judges at sentencing to find all manner of facts about an offender's past crimes. Brief for Court-Appointed *Amicus Curiae* 7.

We have been down this road before. In *Apprendi*, the Court carefully studied the original meaning of the Fifth and Sixth Amendments and found that almost "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" was understood at the time of the Nation's founding to be a fact a jury must find. 530 U. S., at 490; see also *id.*, at 499–512 (THOMAS, J., concurring). In the years since, we have come to the same conclusion in one decision after another. See, *e. g.*, *Mathis*, 579 U. S., at 510; *supra*, at 833–834 (collecting cases).

To reconsider all those precedents now would require, at the least, proof "convincing indeed." *Gaudin*, 515 U. S., at 515. Yet *amicus* offers nothing like that. He points to the "supplemental-information" procedures a few States employed "in the early 19th century." Brief for Court-Appointed *Amicus Curiae* 15. Those procedures allowed prosecutors seeking enhanced penalties premised on a defendant's past convictions to charge them in "a supplemental, post-conviction information," rather than in "a pre-conviction indictment." *Ibid.* And, *amicus* stresses, this Court upheld one State's supplemental-information scheme in *Graham* v. *West Virginia*, 224 U. S. 616 (1912). The principal

_____

from denial of rehearing en banc) (questioning "the continuing viability of *Almendarez-Torres*"); see also *United States* v. *Dudley*, 5 F. 4th 1249, 1278 (CA11 2021) (Newsom, J., concurring in part and dissenting in part).

dissent echoes the same points. *Post*, at 864–867 (opinion of KAVANAUGH, J.).

But, if anything, the evidence *amicus* cites does more to hurt than help his cause. For one thing, a sentencing procedure followed by a few States hardly represents "convincing" proof that our precedents have mistaken the original meaning of the Fifth and Sixth Amendments. *Gaudin*, 515 U. S., at 515; see *id.*, at 519. For another, when this Court upheld one of these supplemental-information schemes in *Graham*, it stressed that, under the law's terms, even "the fact of former conviction" had to be "charged" by prosecutors and then "determined by a jury in a proceeding thereby instituted." 224 U. S., at 630. Put those points together and *amicus*'s evidence provides perhaps more reason to question *Almendarez-Torres*'s narrow exception than to expand it.[5]

Reaching for another tradition, *amicus* (but not the principal dissent) turns to the Constitution's Double Jeopardy Clause. That Clause, *amicus* observes, permits a judge to ask whether the government has charged a defendant for the same crime a second time. From this, he suggests, it must be that a judge can also look into the defendant's past conduct to increase his sentence. Brief for Court-Appointed

_____

[5] *Amicus* emphasizes that supplemental-information procedures became more "widely adopted" in the 1920s after *Graham*. Brief for Court-Appointed *Amicus Curiae* 16. But, since *Apprendi*, this Court has insisted on "remain[ing] true" to the Fifth and Sixth Amendment's original meaning and protecting the rights they secure against "'erosion.'" 530 U. S., at 483. Accordingly, relatively modern innovations move us little, for they might just as well represent departures from the Constitution's historic protections as evidence of them. *Ibid.*; accord, *Gaudin*, 515 U. S., at 518–519. Nor, for that matter, does looking to more modern times do much to help *amicus*. He does not dispute that, even as late as 1965, juries usually still had to find facts about prior convictions, whether under supplemental-information regimes or more traditional ones. See *Apprendi*, 530 U. S., at 489, n. 15; *Almendarez-Torres* v. *United States*, 523 U. S. 224, 261 (1998) (Scalia, J., dissenting).

*Amicus Curiae* 25–26.   But that, too, does not follow.   The
Double Jeopardy Clause protects a defendant by prohibiting
a judge from even *empaneling* a jury when the defendant has
already faced trial on the charged crime.   See, *e. g.*, *Green*
v. *United States*, 355 U. S. 184, 188 (1957).   The Fifth and
Sixth Amendments' jury trial rights provide a defendant
with entirely complementary protections at a different stage
of the proceedings by ensuring that, once a jury *is* lawfully
empaneled, the government must prove beyond a reasonable
doubt to a unanimous jury the facts necessary to sustain the
punishment it seeks.

Finally, *amicus* (rejoined now by the principal dissent,
see *post*, at 863–864 (opinion of KAVANAUGH, J.)) directs us to
case law and statutes in four other States—South Carolina,
Louisiana, Alabama, and Kansas.   After the Constitution's
adoption, *amicus* suggests, each of these States left "a wide
range of recidivism-related issues" for judges, rather than
juries, to resolve.   Brief for Court-Appointed *Amicus
Curiae* 18.

But what does this prove?   Here again, *amicus* points to
procedures in less than a handful of States.   That is not the
kind of "uniform postratification practice" that can some-
times "shed light upon the meaning" of the Constitution.
*Gaudin*, 515 U. S., at 519.   Nor, again, do these practices
prove much even taken on their own terms.   Some of these
States permitted a judge to make "sequencing" determina-
tions—deciding, for example, whether the present offense
was the defendant's " 'second or subsequent' " offense.   Brief
for Court-Appointed *Amicus Curiae* 14, and n. 1, 18–19.[6]
Some allowed a judge to find whether the defendant had suc-
cessfully overturned a prior conviction on appeal or secured

---

[6] See H. Toulmin, Digest of the Laws of the State of Alabama 209 (1823);
Ala. Penal Code § 73 (1866); 1859 Kan. Sess. Laws pp. 283–284; 1868 Kan.
Sess. Laws pp. 380–381; 6 D. McCord, Statutes at Large of South Carolina
413 (1839); *State* v. *Smith*, 8 Rich. 460 (SC 1832); U. Phillips, Revised Stat-
utes of Louisiana 155 (1856); 1870 La. Acts p. 206, § 4.

a pardon. *Id.*, at 19–20, and n. 4.[7] Some authorized a judge to find whether a defendant's current offense and past crime occurred within a specified period of time. *Id.*, at 19.[8] All told, *amicus*'s evidence may suggest that in a small number of jurisdictions judges could find the existence, number, and dates of a defendant's prior convictions. But none of this provides a persuasive basis for revisiting our many precedents prohibiting judges from doing more. Let alone prove " 'a longstanding tradition' " in this Nation allowing a judge to find any fact regarding a defendant's "recidivis[m]." *Post*, at 855 (opinion of KAVANAUGH, J.).

For that matter, it is not clear whether these four States always allowed judges to find even the fact of a defendant's prior conviction. Take South Carolina. In *State* v. *Smith*, 8 Rich. 460 (SC 1832), the court seemed to hold that the government did not have to allege in its indictment that the defendant had been previously convicted "for the crime of horse stealing" because that was a question for "the Court," *id.*, at 460–461. But, as another State's supreme court recognized, in so holding *Smith* may have gone "too far." *State* v. *Burgett*, 22 Ark. 323, 324 (1860). It is unclear, too, whether *Smith* even accurately reflected South Carolina's customary practice. *Apprendi*, 530 U. S., at 509, n. 5 (THOMAS, J., concurring). Similar problems attend *amicus*'s reliance on historic Louisiana practices. In *State* v. *Hudson*, 32 La. Ann. 1052 (1880), the Louisiana Supreme Court held that a jury did not "ha[ve] to pass" upon the existence of "previous convictions." *Id.*, at 1053. But Louisiana "overruled" *Hudson* three decades later, calling it out of step with "the common law" and "other jurisdictions." *State* v. *Compagno*, 125 La. 669, 671–672, 51 So. 681, 682 (1910). Later still, *amicus* contends, Louisiana revived *Hudson* in *State* v. *Guidry*, 169 La. 215, 222, 124 So. 832, 835 (1929). See Brief for Court-Appointed *Amicus Curiae* 14. But however that

---

[7] See 1840 Ala. Sess. Laws 153; 1868 Kan. Sess. Laws pp. 380–381; *State* v. *Hudson*, 32 La. Ann. 1052, 1053 (1880).

[8] Toulmin, Digest of the Laws of the State of Alabama, at 377.

may be, the historical practices in the four States *amicus* highlights do not appear to have been nearly as uniform or expansive as he supposes.

D

Finally, *amicus* asks us to consider some practical problems. Most especially, he argues that leaving the occasions inquiry to juries would do more to prejudice than protect defendants. *Id.*, at 41–47. It would because requiring prosecutors to prove that the defendant's prior crimes took place on distinct occasions would enable them "to regale juries with the details" of the defendant's past misconduct. *Id.*, at 42; see also *post*, at 867–870 (opinion of KAVANAUGH, J.); *post*, at 889–893 (opinion of JACKSON, J.).

But just as arguments from efficiency cannot alter the demands of the Fifth and Sixth Amendments, neither may that practical concern, "of which earlier courts were well aware." *Apprendi*, 530 U. S., at 521 (THOMAS, J., concurring). It is hard not to wonder, too: Are we really to suppose that the *amici* supporting Mr. Erlinger in this Court, including the National Association of Criminal Defense Lawyers and the National Association of Federal Defenders, have been "somehow duped" into advocating for a rule that would be "unfair to criminal defendants"? *Blakely*, 542 U. S., at 312; see also NAFD Brief 25; Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 16–17.

Of course not. As these groups stress, and the government agrees, traditional tools exist to address the prejudicial effect evidence about a defendant's past crimes can have on a jury. Most obviously, a court can bifurcate the proceedings. In that "common," *Apprendi*, 530 U. S., at 521, n. 10 (THOMAS, J., concurring), and often "fairest" practice, *Spencer* v. *Texas*, 385 U. S. 554, 567 (1967), a jury is first tasked with assessing whether the government has proved the elements of the § 922(g) felon-in-possession charge. Then, and only if it finds the defendant guilty, the jury turns to consider evidence regarding whether the defendant's prior offenses occurred on different occasions for purposes of applying

ACCA's mandatory minimum sentence under § 924(e).   Jus-
tice Jackson expresses concern about the "burdens" pro-
ceeding this way might impose.   See *post*, at 892.   But by
sequencing and separating the jury's determinations, a court
decreases the likelihood that a jury will be " 'overper-
suade[d]' " by the defendant's prior criminal conduct.   *Post*,
at 893 (Jackson, J., dissenting) (quoting *Michelson* v. *United
States*, 335 U. S. 469, 476 (1948)).

On this, all sides agree.   The government reports that it
"generally agree[s] to bifurcation" in ACCA cases like this
one and that it has not "been able to anticipate as to why
[it] wouldn't agree to bifurcation."   Tr. of Oral Arg. 58–59.
Similarly, the National Association of Federal Defenders
reports that, "[t]o [its] knowledge, every jury trial but one
has been bifurcated when the jury was permitted to decide
*both* the § 922(g) unlawful-firearm-possession question and
the § 924(e) 'occasions' question."   NAFD Brief 26.[9]   States
that "have not already done so can likewise adjust to any
state-law implications of [our] straightforward application of
*Apprendi* to . . . ACCA's different-occasions requirement."
Reply Brief 21; see also *Spencer*, 385 U. S., at 586 (Warren,
C. J., concurring and dissenting) (observing that, whether or
not required to do so, at the time most States had adopted
"procedures which postpone the introduction of prior convic-
tions until after the jury has found the defendant guilty of
the crime currently charged").[10]

---

[9] Of the trials where proceedings were bifurcated, the National Associa-
tion of Federal Defenders observes, some "have resulted in acquittal or
dismissal" at the first stage where prejudicial past conduct was omitted;
another has resulted in acquittal at the second stage after the jury found
the government had not carried its burden of showing the defendant's
prior offenses were committed on separate occasions; three others "have
resulted in guilty verdicts" at both stages.   NAFD Brief 21–22.

[10] Once more parting ways with the parties and defense bar *amici*, Jus-
tice Jackson asserts that *Apprendi*'s rule confining judges at sentencing
to the facts found by the jury hurts defendants and makes "racial dispari-
ties" in our criminal justice system "worse."   *Post*, at 886–887.   As we

*

The jury trial may have "never been efficient." *Apprendi*, 530 U. S., at 498 (Scalia, J., concurring).   It may require assembling a group of the defendant's peers to resolve unanimously even seemingly straightforward factual questions under a daunting reasonable doubt standard.   Avoiding the prejudice associated with the introduction of evidence of past crimes may require careful attention, too.   But the right to a jury trial "has always been" an important part of what keeps this Nation "free."   *Ibid.*   Because the Fifth and Sixth Amendments do not tolerate the denial of that right in this case, the judgment of the Court of Appeals for the Seventh Circuit is vacated, and the matter is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE ROBERTS, concurring.

I join the opinion of the Court because I agree that under the Fifth and Sixth Amendments, a defendant is entitled to

---

have seen, however, *Apprendi* allows judges to *lower* sentences based on their own factual findings; it only prohibits judges from using their own facts to *increase* a defendant's exposure to punishment.   See n. 1, *supra.* As the defense bar *amici* are quick to point out, that helps defendants. It seems, too, JUSTICE JACKSON has directed her fire at the wrong target. The reports and law review article cited by JUSTICE JACKSON attribute sentencing disparities to this Court's remedial decision in *United States* v. *Booker*, 543 U. S. 220, 245–246 (2005), as well as various other factors: judges, "prosecutors, law enforcement officials, probation officers . . . , overworked defense attorneys, and other actors involved in maintaining the court system."   K. Klein & S. Klein, A Racially Biased Obstacle Course:   *Apprendi* Transformed the Federal Sentencing Guidelines into a Series of Judicial Obstacles; Can Shame Reduce the Racial Disparities?, 99 N. C. L. Rev. 1391, 1405, 1423 (2021).   And, unlike JUSTICE JACKSON, the authors of the very article she cites "celebrate *Apprendi*" because, in their view, it "unequivocally" gives a "bargaining chip" to defendants to seek more favorable plea offers.   *Id.*, at 1399, and n. 33; see *Blakely*, 542 U. S., at 311–313.

have a jury determine beyond a reasonable doubt whether his predicate offenses were committed on different occasions for purposes of the Armed Career Criminal Act. But as Justice Kavanaugh explains, violations of that right are subject to harmless error review. See *post*, at 859–861 (dissenting opinion). The Seventh Circuit should thus consider on remand the Government's contention that the error here was harmless.

Justice Thomas, concurring.

I join the Court's opinion in full because it correctly applies our precedents. The fact that a defendant's prior qualifying offenses occurred on "occasions different from one another" results in an increased punishment under the Armed Career Criminal Act. 18 U. S. C. § 924(e)(1). The Sixth Amendment therefore gives criminal defendants the right to have a jury find that fact. See *Apprendi* v. *New Jersey*, 530 U. S. 466, 501 (2000) (Thomas, J., concurring) ("[A] 'crime' includes *every fact* that is by law a basis for imposing or increasing punishment" (emphasis added)).

In *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998), the Court created a "narrow exception" to the Sixth Amendment's general rule and allowed a judge to find "the fact of a prior conviction," even though that fact increases a defendant's punishment, *Alleyne* v. *United States*, 570 U. S. 99, 111, n. 1 (2013). In this case, the Court acknowledges the sharp conflict between *Almendarez-Torres* and the Sixth Amendment. *Ante*, at 837–838. And, it properly declines to extend that dubious exception to the different-occasions inquiry under § 924(e)(1). *Ante*, at 836–842.

I continue to adhere to my view that we should revisit *Almendarez-Torres* and correct the "error to which I succumbed" by joining that decision. *Apprendi*, 530 U. S., at 520 (opinion of Thomas, J.); see also *Sessions* v. *Dimaya*, 584 U. S. 148, 226 (2018) (Thomas, J., dissenting); *Mathis* v. *United States*, 579 U. S. 500, 522 (2016) (Thomas, J., con-

curring); *Descamps* v. *United States*, 570 U. S. 254, 280–281 (2013) (THOMAS, J., concurring in judgment); *Rangel-Reyes* v. *United States*, 547 U. S. 1200, 1202 (2006) (THOMAS, J., dissenting from denial of certiorari); *Shepard* v. *United States*, 544 U. S. 13, 27–28 (2005) (THOMAS, J., concurring in part and concurring in judgment). We need not overrule *Almendarez-Torres* to rule in Erlinger's favor, and he did not ask us to reconsider the decision—although he agrees that it should be overruled. Tr. of Oral Arg. 5. But, we have no shortage of other cases. Each Term, criminal defendants file a flood of petitions "specifically presenting this Court with opportunities to reconsider *Almendarez-Torres*." *Rangel-Reyes*, 547 U. S., at 1202 (opinion of THOMAS, J.). Today's decision demonstrates further that "[i]t is time for this Court to do its part" by granting one of those many petitions and overruling *Almendarez-Torres*. *Rangel-Reyes*, 547 U. S., at 1202.

JUSTICE KAVANAUGH, with whom JUSTICE ALITO joins, and with whom JUSTICE JACKSON joins except as to Part III, dissenting.

To prevent and punish violent crime committed with firearms, Congress has enacted numerous federal laws—most notably the National Firearms Act of 1934, the Gun Control Act of 1968, and the Armed Career Criminal Act of 1984. This case concerns the Armed Career Criminal Act.

As relevant here, ACCA imposes a minimum sentence on a defendant who previously was convicted of at least three violent felonies committed on different occasions—and who then, after the three prior violent felony convictions, unlawfully possessed a firearm. In applying ACCA's minimum sentencing requirement, the Sixth Amendment allows a judge to determine whether the defendant has three or more prior convictions and whether those convictions were for violent felonies. The question in this case is whether the judge may also determine whether the defendant committed those

prior crimes on different occasions, or instead whether a jury must do so.

In my view, this Court's precedents establish that a judge may make the different-occasions determination. Because the Court today concludes that only a jury may make the different-occasions determination, I respectfully dissent.

I

Paul Erlinger has been convicted of at least 9 felonies, including at least 7 burglaries. Under federal law, he therefore may not possess a firearm. See 18 U. S. C. §922(g)(1). As a multiple-time convicted felon, Erlinger would have received repeated notice that he could not legally possess any firearms. Yet in 2017, the police received a tip that Erlinger had recently violated that federal law and purchased a gun. Pursuant to a search warrant, officers searched his home and found 20 guns—16 long guns and 4 handguns—and ammunition to go with them. Erlinger pled guilty to possessing a firearm as a felon, in violation of §922(g).

At sentencing, the Government argued that the Armed Career Criminal Act mandated a minimum prison sentence because Erlinger had previously been convicted of at least three violent felonies committed on different occasions. The Government presented the charging documents and plea agreement for three offenses that Erlinger committed in 1991: (i) an April 4 burglary of a pizza restaurant; (ii) an April 8 burglary of a sporting-goods store; and (iii) an April 11 burglary of another restaurant. The U. S. District Court for the Southern District of Indiana determined that Erlinger had been convicted of each of those burglaries, and that those offenses qualified as violent felonies. Erlinger did not question the judge's authority to make those determinations. The District Court then concluded that Erlinger committed the three burglaries on "occasions different from one another." §924(e)(1).

On appeal, despite accepting the District Court's authority to determine whether he was convicted of the three prior violent felonies, Erlinger argued that the Sixth Amendment required a jury, not a judge, to determine whether he committed the felonies on different occasions. That was not a promising argument. Like all 11 other Courts of Appeals that handle federal criminal cases, the U. S. Court of Appeals for the Seventh Circuit had previously ruled that a judge may determine whether a defendant's prior felonies were committed on different occasions. Adhering to that Circuit precedent, the Seventh Circuit therefore rejected Erlinger's argument. 77 F. 4th 617, 621–622 (2023) (citing *United States* v. *Elliott*, 703 F. 3d 378, 382 (2012)).

The Court today, however, rejects the unanimous conclusion of the 12 Courts of Appeals. The Court holds that a jury must determine whether a defendant committed his prior felonies on different occasions. I respectfully disagree.

## II

The Sixth Amendment guarantees criminal defendants the right to a "trial" by an "impartial jury." Relying on text and history, this Court's precedents have interpreted the Sixth Amendment to draw a clear line between (i) the facts about the present crime that a jury must decide at trial and (ii) the facts about past crimes that a judge may determine at sentencing.

In a series of cases that began with *Apprendi* v. *New Jersey*, the Court has held that a jury must find facts about a defendant's present offense that alter the crime's maximum or minimum possible sentence. 530 U. S. 466, 490 (2000). But *Apprendi* and this Court's subsequent cases have not disturbed the longstanding sentencing rule that this Court recognized two years earlier in *Almendarez-Torres* v. *United States*: Judges may resolve questions about a defendant's past crimes—questions of recidivism—that are relevant not to the defendant's guilt for the present offense but rather to

the length of the defendant's sentence.    523 U. S. 224, 239, 247 (1998).

## A

This Court's opinion in *Almendarez-Torres* resolves the question of whether a judge may decide if the defendant committed his prior violent offenses on different occasions.    In that case, the Court squarely held that either a judge or a jury may apply sentence enhancements based on "recidivism."    *Id.*, at 247.

*Almendarez-Torres* involved a statute that made it a crime for a deported noncitizen to illegally reenter the United States.    *Id.*, at 229.    The maximum sentence for that crime was 2 years.    *Ibid.*    But if the noncitizen had been convicted of certain aggravated felonies before he was deported, the maximum sentence for illegal reentry increased to 20 years.    *Ibid.*

Almendarez-Torres argued that the Constitution required "Congress to treat recidivism as an element of the offense." *Id.*, at 239.    If so, the Government would have to prove to a jury beyond a reasonable doubt that Almendarez-Torres had been convicted of an aggravated felony before his deportation.    *Ibid.*    This Court rejected that argument.    *Id.*, at 247.    Recidivism, the Court stated, "is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence."    *Id.*, at 243.    It is not an element of the present crime of illegal reentry.    *Id.*, at 247; see also *Jones* v. *United States*, 526 U. S. 227, 249 (1999); *Graham* v. *West Virginia*, 224 U. S. 616, 629 (1912).

The Court explained that the Federal and State Governments have long taken different approaches to applying recidivism sentencing enhancements.    *Almendarez-Torres*, 523 U. S., at 246.    Some provide a jury trial.    *Ibid.*    Others assign recidivism enhancements to the sentencing judge. *Ibid.*

Given the absence of any "uniform" "tradition," the Court concluded that the choice between those methods was left to the Legislature, not governed by "a federal constitutional

guarantee." *Id.*, at 246–247. To hold "that the Constitution requires that recidivism be deemed an 'element' of petitioner's offense would mark an abrupt departure from a longstanding tradition" where a judge or a jury could determine that a defendant is a recidivist. *Id.*, at 244.

Importantly, that tradition of allowing judges to apply recidivism sentencing enhancements developed so as to avoid significant prejudice to criminal defendants. If the jury had to determine recidivism, the jury would hear highly prejudicial evidence about a defendant's past criminal offenses at the trial for the present crime. *Id.*, at 235.

In short, in *Almendarez-Torres* the Court held that the Legislature can decide how it wants recidivism enhancements to be applied—by a judge or by a jury. *Id.*, at 246–247.

ACCA mandates a minimum sentence if the defendant had three prior convictions for violent felonies committed on different occasions. Erlinger does not dispute that *Almendarez-Torres* allows a judge to determine whether Erlinger had three prior convictions for violent felonies. The narrow question here is whether *Almendarez-Torres* also allows a judge to determine whether Erlinger's three prior offenses were committed on different occasions.

I would conclude that *Almendarez-Torres* also applies to the different-occasions inquiry. Under *Almendarez-Torres*, legislatures may assign to judges the task of finding facts related to a defendant's past crimes—that is, to his "recidivism." *Id.*, at 239. That principle encompasses the different-occasions inquiry.

After all, the enhancement in *Almendarez-Torres* applied when "the defendant was previously deported subsequent to a conviction for commission of an aggravated felony." *Id.*, at 235 (quotation marks omitted). To apply that enhancement, a judge had to find the date on which the defendant was convicted of the aggravated felony. The judge had to find that the defendant in fact was the person who had committed the aggravated felony. And the judge had to find that the defendant had been deported after that date.

Like the statute in *Almendarez-Torres*, recidivism statutes often require a decisionmaker to determine the who, what, when, and where of prior offenses. The *Almendarez-Torres* Court had no difficulty concluding that Congress could authorize judges to make the factual findings necessary to apply the recidivism enhancement. *Id.*, at 246. To the extent that *Almendarez-Torres* left any doubt on that score, this Court recognized the case's "precise holding" the following year: The "distinctive significance of recidivism" distinguishes it from elements of the present crime. *Jones*, 526 U. S., at 248–249. *Almendarez-Torres* thus means that judges can make all recidivism determinations at sentencing. Only that rule can explain this Court's cases allowing judges to find recidivism-related facts. See, *e. g.*, *McNeill* v. *United States*, 563 U. S. 816, 820, 824 (2011); *Shepard* v. *United States*, 544 U. S. 13, 20–21 (2005).

ACCA's different-occasions requirement similarly requires the judge to find the when and where of a defendant's prior criminal acts. Therefore, under *Almendarez-Torres*, judges may make the different-occasions determination. Given the Court's opinion in *Almendarez-Torres*, it comes as no surprise that all 12 Courts of Appeals have concluded that judges may make the different-occasions determination. See *United States* v. *Ivery*, 427 F. 3d 69, 74–75 (CA1 2005); *United States* v. *Santiago*, 268 F. 3d 151, 156 (CA2 2001); *United States* v. *Blair*, 734 F. 3d 218, 227–228 (CA3 2013); *United States* v. *Brown*, 67 F. 4th 200, 201 (CA4 2023); *United States* v. *Davis*, 487 F. 3d 282, 288 (CA5 2007); *United States* v. *Burgin*, 388 F. 3d 177, 186 (CA6 2004); *United States* v. *Elliott*, 703 F. 3d 378, 381–383 (CA7 2012); *United States* v. *Harris*, 794 F. 3d 885, 887 (CA8 2015); *United States* v. *Walker*, 953 F. 3d 577, 580–582 (CA9 2020); *United States* v. *Harris*, 447 F. 3d 1300, 1304 (CA10 2006); *United States* v. *Weeks*, 711 F. 3d 1255, 1259 (CA11 2013); *United States* v. *Thomas*, 572 F. 3d 945, 952, n. 4 (CADC 2009).

KAVANAUGH, J., dissenting

## B

In concluding that *Almendarez-Torres* does not authorize judges to make the different-occasions determination, the Court says that subsequent decisions of this Court have "expressly delimited" the reach of *Almendarez-Torres*. *Ante*, at 838, and n. 2 (citing *United States* v. *Haymond*, 588 U. S. 634, 644, n. 3 (2019) (plurality opinion); *Mathis* v. *United States*, 579 U. S. 500, 511–512 (2016); *Descamps* v. *United States*, 570 U. S. 254, 269 (2013); *Alleyne* v. *United States*, 570 U. S. 99, 111, n. 1 (2013); *Cunningham* v. *California*, 549 U. S. 270, 282 (2007); *Shepard*, 544 U. S., at 24 (plurality opinion); *Blakely* v. *Washington*, 542 U. S. 296, 301 (2004); *Apprendi*, 530 U. S., at 490).

But the cases cited by the Court do not support its claim that *Almendarez-Torres* has been cabined, at least not in a way that would require a jury to make the different-occasions finding.

Many of those cited cases did not involve recidivism. Both *Alleyne* v. *United States* and *Apprendi* v. *New Jersey* addressed the present crime, not prior crimes. 570 U. S., at 104; 530 U. S., at 468–469. Neither case revisited *Almendarez-Torres*'s analysis of the distinctive history of recidivism sentencing enhancements for prior offenses. Indeed, both *Alleyne* and *Apprendi* expressly declined to "revisit" *Almendarez-Torres*. 570 U. S., at 111, n. 1; 530 U. S., at 490. And in analyzing *Almendarez-Torres*, *Apprendi* drew a clear line between facts about prior crimes and facts about present crimes. 530 U. S., at 488. *Apprendi* said as much multiple times. *Id.*, at 474, 488–489, and n. 14, 496.[1]

---

[1] The other constitutional cases that the Court cites similarly did not involve recidivism. See *United States* v. *Haymond*, 588 U. S. 634, 645–646 (2019) (plurality opinion) ("additional conduct in violation of" the defendant's supervised release); *Cunningham* v. *California*, 549 U. S. 270, 275 (2007) (facts about the defendant's "violent conduct" in committing the charged crime); *Blakely* v. *Washington*, 542 U. S. 296, 298 (2004) (defend-

The other cases cited by the Court did not even involve a constitutional claim. In *Mathis* v. *United States* and *Descamps* v. *United States*, the Court interpreted the text of ACCA in order to determine whether a prior conviction constituted a "violent felony." 579 U. S., at 503 (quotation marks omitted); 570 U. S., at 257 (same); see also *Shepard*, 544 U. S., at 15–16, 19. To be sure, the Court said that its interpretation of ACCA avoided "Sixth Amendment concerns." *Mathis*, 579 U. S., at 511; *Descamps*, 570 U. S., at 267. But neither case purported to articulate any Sixth Amendment holding.

Importantly, constitutional avoidance "is not a method of adjudicating constitutional questions by other means." *Clark* v. *Martinez*, 543 U. S. 371, 381 (2005). When the Court flags potential constitutional concerns in a statutory case, that is a far cry from the Court's definitively resolving the potential constitutional issue, let alone altering previously binding constitutional precedent. A prior constitutional-avoidance holding does not absolve the Court of the duty to address the constitutional issue head-on when it is later presented to the Court. The Court's decision today mistakenly elevates constitutional-avoidance holdings to constitutional holdings.

*Almendarez-Torres* said what it said: The Constitution does not require a jury to make recidivism determinations. And no subsequent case of this Court has cabined the holding of *Almendarez-Torres*. By distinguishing the different-occasions issue from the other facts about prior crimes, today's decision mistakenly crosses the clear line that *Almendarez-Torres* and *Apprendi* drew between facts about the present offense and facts about prior offenses.[2]

_____

ant acted with "deliberate cruelty" in committing the charged crime (quotation marks omitted)).

[2] Unlike the Court's interpretation of ACCA in cases like *Mathis* and *Descamps*, moreover, the Court's new constitutional rule will apply not only to federal cases, but also to state cases. Several States have recidi-

## III

Even accepting the Court's interpretation of the Sixth Amendment as to the different-occasions issue, Erlinger's sentence should be affirmed. As the Government says, any error was harmless. Tr. of Oral Arg. 45.

This Court has long ruled that most constitutional errors, including Sixth Amendment errors, "can be harmless." *Washington* v. *Recuenco*, 548 U. S. 212, 218 (2006) (quotation marks omitted). The harmless-error rule serves an important purpose. It ensures that appellate courts do not set aside convictions or sentences "for small errors or defects that have little, if any, likelihood of having changed the result." *Neder* v. *United States*, 527 U. S. 1, 19 (1999) (quotation marks omitted). So if a constitutional error is harmless "beyond a reasonable doubt," the defendant's conviction and sentence should be affirmed. *Id.*, at 18.

The harmless-error rule will likely ameliorate some of the short-term problems that today's decision otherwise would cause. In any case that has not become final, the relevant appellate court can apply harmless-error analysis.[3]

In most (if not all) cases, the fact that a judge rather than a jury applied ACCA's different-occasions requirement will be harmless. Whether prior felonies occurred on different occasions under ACCA is usually a straightforward question. As this Court succinctly stated in *Wooden*, courts "have

---

vism enhancements that require judges to find whether the defendant committed prior crimes on different occasions. See, *e. g.*, 42 Pa. Cons. Stat. § 9714(a)(2) (2019); R. I. Gen. Laws § 12–19–21 (2002). Those state courts, like the federal courts, have long relied on *Almendarez-Torres* to hold that judges may make that different-occasions determination. See, *e. g.*, *Commonwealth* v. *Gordon*, 596 Pa. 231, 251, and n. 16, 942 A. 2d 174, 186, and n. 16 (2007); *State* v. *Ramirez*, 936 A. 2d 1254, 1269 (R. I. 2007). Those courts, too, will be surprised by today's new rule.

[3] For any case that is already final, the *Teague* rule will presumably bar the defendant from raising today's new rule in collateral proceedings. See *Edwards* v. *Vannoy*, 593 U. S. 255, 258 (2021); *Teague* v. *Lane*, 489 U. S. 288, 310 (1989) (plurality opinion).

nearly always treated offenses as occurring on separate occasions if a person committed them a day or more apart, or at a significant distance." *Wooden* v. *United States*, 595 U. S. 360, 370 (2022) (quotation marks omitted). So in cases like this where undisputed facts establish that the defendant's prior crimes occurred a day or more apart, it will usually be evident beyond a reasonable doubt that the failure to submit the different-occasions question to the jury had no effect on the defendant's sentence.[4]

This case is a good example. There can be no reasonable doubt that Erlinger committed three burglaries "on occasions different from one another." 18 U. S. C. § 924(e)(1). Erlinger burglarized three separate businesses, and each burglary occurred several days apart from the other two. His crimes had different victims, different dates, and different locations. And when offered the opportunity to dispute the District Court's conclusion that he committed the three burglaries on different occasions, "Erlinger supplied no argument or evidence that would cast doubt" on the District Court's analysis. 77 F. 4th, at 622.

In this Court, Erlinger's argument on harmless error was not much more enlightening. When asked whether he had "a viable argument" against harmless error, Erlinger responded that he could "imagine somebody" who might. Tr. of Oral Arg. 25. For example, Erlinger hypothesized that someone might commit a string of burglaries several days apart to pay a single gambling debt. *Ibid.* Of course, Erlinger did not argue that he actually fit that description. And regardless, no "rational jury" could think that separate burglaries days apart in different places collapse into one occasion simply because the defendant committed the burglaries to pay a single debt. *Neder*, 527 U. S., at 18.

―――――――――

[4] Going forward, I assume that the *Wooden* statement about offenses committed a day or more apart or at a significant distance will inform the content of jury instructions.

For those reasons, I would hold that any Sixth Amendment error in this case was harmless. I recognize that this Court often leaves harmless-error questions to the Court of Appeals when the issue was not addressed below. See *id.*, at 25. But that is because harmless-error questions sometimes are fact-intensive and require painstaking analysis of a large record. Here, the relevant facts are simple and undisputed: Erlinger committed three burglaries of three different businesses on three different days, with several days separating each burglary. I would resolve the harmless-error issue in this case now rather than subjecting the parties to a pointless remand to the Court of Appeals and another round of briefing and argument, when the Court of Appeals' decision is a foregone conclusion. The Court declines to do so. But the harmless-error analysis will be straightforward for the Court of Appeals on remand.

## IV

The Court today has not overruled *Almendarez-Torres*; it has simply carved out the different-occasions inquiry from the general *Almendarez-Torres* rule. But JUSTICE THOMAS has written separately to advocate overruling *Almendarez-Torres* altogether. *Ante*, at 851 (concurring opinion). And Erlinger agreed that "the Court should someday" overrule that precedent. Tr. of Oral Arg. 5.

Applying the traditional *stare decisis* factors, I am strongly opposed to overruling *Almendarez-Torres*.

The principle of *stare decisis* is encompassed within the "judicial Power" of Article III of the Constitution. *Stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). Of course, adherence to constitutional precedent is not and should not be absolute. See *Ramos* v. *Louisiana*, 590 U. S. 83, 116–117 (2020) (KAVANAUGH, J.,

concurring in part). But the Court requires a "special justification" or "strong grounds" before revisiting a settled holding. *Id.*, at 120 (quotation marks omitted). That requirement "disciplines jurisprudential disagreement." A. Barrett, Precedent and Jurisprudential Disagreement, 91 Texas L. Rev. 1711, 1722 (2013).

In general, when considering whether to overrule a constitutional precedent, the Court analyzes a variety of factors that often boil down to three basic questions. First, "is the prior decision not just wrong, but grievously or egregiously wrong?" *Ramos*, 590 U. S., at 121 (KAVANAUGH, J., concurring in part). Second, "has the prior decision caused significant negative jurisprudential or real-world consequences?" *Id.*, at 122. And third, "would overruling the prior decision unduly upset reliance interests?" *Ibid.*

Overruling *Almendarez-Torres* would require running the table on all three. As I see it, however, the argument for overruling *Almendarez-Torres* does not satisfy *any* of the three requirements.

## A

On the merits, I believe that *Almendarez-Torres* is correct in light of text and history. But even if one thinks that the case is wrong, it certainly is not egregiously wrong.

The Sixth Amendment textually guarantees the right to a jury trial, but its text does not specify all that the right entails. Instead, to define the jury right, the Court has looked to the common law, state practices in the founding era, opinions and treatises written soon afterward, and this Nation's historical tradition. See *Ramos*, 590 U. S., at 90. When those sources supply a clear answer, we can conclude that a rule is part of the jury right enshrined in the Sixth Amendment and therefore cannot be changed by the legislature. See *id.*, at 90–92.

No settled historical practice or understanding establishes that a jury, rather than a judge, must determine for sentencing purposes whether a defendant is a recidivist.

KAVANAUGH, J., dissenting

Statutes that enhance repeat offenders' sentences "have a long tradition in this country that dates back to colonial times." *Parke* v. *Raley*, 506 U. S. 20, 26 (1992). Given the prevalence of those statutes, if there were a legal consensus that a jury had to determine a defendant's recidivism, we should be able to easily locate that consensus in the States' laws. After all, as the Court reminds us, every state constitution ratified in the aftermath of the Revolution guaranteed a right to a trial by jury. *Ante*, at 829–830. Those state constitutional rights are analogous to the right guaranteed by the Sixth Amendment.

But the States have traditionally used a "wide variety of methods of dealing with" recidivism enhancements. *Spencer* v. *Texas*, 385 U. S. 554, 566 (1967); see also *Almendarez-Torres* v. *United States*, 523 U. S. 224, 246–247 (1998). And some States have long given judges the responsibility to find the facts necessary to apply a recidivism sentencing enhancement for past crimes. States have done so to avoid the prejudice to the defendant that would result from telling the jury about the defendant's prior crimes.

One example is South Carolina. There, in the 1830s, the State had a steep recidivism enhancement for horse thieves. *State* v. *Smith*, 8 Rich. 460 (S. C. 1832). The "Court, not the jury" decided whether the enhancement applied. *Id.*, at 461; see also *State* v. *Allen*, 8 Rich. 448, 449 (S. C. 1832); *State* v. *Parris*, 89 S. C. 140, 141, 71 S. E. 808, 809 (1911).

Louisiana similarly recognized that facts about recidivism "were not essential ingredients constituting the offense charged, upon which the jury had to pass." *State* v. *Hudson*, 32 La. 1052, 1053 (1880). As the Supreme Court of Louisiana later explained, there "is no provision in the Constitution that we have been able to find which authorizes or requires questions of fact not pertaining to the guilt or innocence of a defendant to be submitted to a jury." S*tate* v. *Guidry*, 169 La. 215, 224, 124 So. 832, 835 (1929). Instead, the court held that the Louisiana Legislature could decide

whether a judge or a jury should apply the recidivism sentencing enhancement.

So did Alabama. See *Yates* v. *State*, 245 Ala. 490, 492, 17 So. 2d 777, 779 (1944) (It is "discretionary with the trial judge whether to impose additional punishment and to make inquiry into that question in a supplementary manner in order to apply the increased limits").

And Kansas. See *State* v. *Woodman*, 127 Kan. 166, 172, 272 P. 132, 134 (1928) ("In this state it is no concern of the jury" whether a recidivism enhancement applies); see also *Chance* v. *State*, 195 Kan. 711, 715, 408 P. 2d 677, 681 (1965) ("It has never been the rule in Kansas" that recidivism has to be treated as an element of a crime (quotation marks omitted)); see also 1868 Kan. Sess. Laws pp. 380–381 (recidivism enhancement).

The variation in early American practice forecloses the argument that the right to have a jury apply recidivism enhancements was traditionally understood as an inherent part of the Sixth Amendment right to trial by jury.[5]

Another common practice in the early 1800s confirms that legislatures could choose how to handle recidivism issues. Early state constitutions required the government to include the elements of an offense in an indictment. See, *e. g.*, *Jones* v. *Robbins*, 74 Mass. 329, 347, 350 (1857). The prosecution also had to prove elements of the offense beyond a reasonable doubt, as the requirements for an indictment and a jury trial went hand in hand. *Commonwealth* v. *McKie*, 67 Mass. 61, 62 (1854).

---

[5] A different constitutional rule applies if the defendant's status as a felon is an element of the present offense necessary to make the conduct criminal in the first place, as with the prohibition on possessing a firearm as a felon. See 18 U. S. C. § 922(g)(1); *Rehaif* v. *United States*, 588 U. S. 225, 229–230 (2019). The issue here, by contrast, is the use of past offenses to enhance the sentence for the present offense of conviction.

KAVANAUGH, J., dissenting

But many States, including Massachusetts and Virginia, did not include the facts about past crimes in an indictment—in other words, did not treat recidivism as an element of the offense.   See 1818 Mass. Acts pp. 603–604; 1819 Va. Acts ch. 171, pp. 619–620; 1824 Me. Laws p. 1009; 1868 W. Va. Acts ch. 165, pp. 733–734.   Those States allowed the government to raise and prove recidivism after the defendant had been convicted of the present crime.   Those States' practices reflected and reinforced the familiar line between a conviction for the present offense and a sentencing enhancement based on past offenses.

State courts upheld that practice against constitutional challenges.   In 1824, the Massachusetts Supreme Judicial Court held that even if the recidivism enhancement would have been included in the original indictment "at common law," the "legislature had" the power to change that default rule.   *In re Ross*, 19 Mass. 165, 171; see also *State* v. *Graham*, 68 W. Va. 248, 251, 69 S. E. 1010, 1011 (1910) (The West Virginia recidivism statute "is not contrary to any constitutional provision").

Importantly, this Court upheld that practice as well.   In *Graham* v. *West Virginia*, the Court reasoned that although "the State may properly provide for the allegation of the former conviction in the indictment," there was "no constitutional mandate" to do so.   224 U. S. 616, 629 (1912).

In short, the historical evidence reveals a "spectrum of state procedures" for applying recidivism-based sentence enhancements.   *Spencer*, 385 U. S., at 566.   America has a long tradition of legislative discretion over whether a judge or jury will apply recidivism sentencing enhancements.[6]

_____

[6] Throughout much of American history, criminal sentencing at both the state and federal levels has often been done by judges in systems where the judges have discretion to sentence within broad ranges.   And in those discretionary-sentencing systems, judges routinely determine the facts of a defendant's prior convictions and take account of a defendant's criminal

The different state approaches did not pop up by accident. The States had good reason to experiment with different approaches to recidivism enhancements. Why? Requiring the Government to present evidence of a defendant's past crimes to a jury at trial would undermine the right to trial "by an impartial jury" that the Sixth Amendment protects.

As this Court "has long recognized, the introduction of evidence of a defendant's prior crimes risks significant prejudice." *Almendarez-Torres*, 523 U. S., at 235. That kind of prior-crimes evidence "is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson* v. *United States*, 335 U. S. 469, 476 (1948). To avoid that problem, American evidence laws have long restricted the use of prior-crimes evidence. See 1 J. Wigmore, Evidence §§ 193–194, pp. 231–235 (1904); Fed. Rule Evid. 404(b)(1).

What good would that longstanding evidence principle be if the jury always had to apply recidivism enhancements? The price of having a jury apply recidivism sentencing enhancements would be the loss of a protection against prejudicial evidence that itself is deeply entrenched in American law. To avoid making defendants pay that price, some legislatures have long given judges the responsibility of applying sentence enhancements—while reserving to juries the duty to fairly decide the defendant's guilt for the present crime. See, *e. g.*, *Hudson*, 32 La., at 1053 (A judge may determine "previous convictions" because that information "might prejudice the jury"); *Woodman*, 127 Kan., at 172, 272 P., at 134–135 ("the jurors' minds should not be diverted from the question of defendant's innocence or guilt by facts concerning defendant's prior convictions of other felonies," and it "is also fairer to defendant to keep such matters entirely away from the jury"); see also D. Sidikman, Note, The Pleading and

------

record in imposing a sentence within the broad sentencing range authorized by statute.

Proof of Prior Convictions in Habitual Criminal Prosecutions, 33 N. Y. U. L. Rev. 210, 215 (1958) (allowing judges to apply recidivism enhancements ensures that the "jury trial as to the charged offense is conducted in a nonprejudicial atmosphere"). The distinctive tradition that governs recidivism enhancements for past offenses has traditionally co-existed with the general right to a jury trial for present offenses.

To sum up: Since the early 1800s, some legislatures have entrusted recidivism sentencing findings to judges, and others have required juries to make those findings. That variation reflects the many countervailing interests that legislatures must balance on this issue—including the prejudice that results from telling a jury about a defendant's past criminal behavior. And that unsurprising variation makes clear that *Almendarez-Torres* was and remains correct. The Sixth Amendment allows a judge to determine whether the defendant should receive a recidivism sentencing enhancement. At a minimum, the history shows that *Almendarez-Torres* is not egregiously wrong.

B

Suppose, however, that one thinks that *Almendarez-Torres* is wrong, even egregiously wrong. Even then, the two other *stare decisis* factors—consequences and reliance interests—strongly counsel in favor of adhering to *Almendarez-Torres* rather than overruling it.

*First*, *Almendarez-Torres* has not generated the kind of negative real-world or jurisprudential consequences that would support an overruling. By allowing judges to apply recidivism enhancements, *Almendarez-Torres* has ensured that defendants need not choose between (i) their right to a jury trial and (ii) their interest in keeping the details of past crimes from a jury.

Consider the prejudice that overruling *Almendarez-Torres* would cause if a jury had to decide whether defendants

are eligible for every state and federal recidivism sentencing enhancement. As happened in one recent federal trial, the jury could hear a prosecutor's closing argument begin: "Ladies and gentlemen of the jury, this defendant, a gun toting, drug slinging three time convicted felon . . . ." *United States* v. *Harrell*, No. 1:22–cr–20245 (SD Fla., Mar. 6, 2023), ECF Doc. 105, p. 33. The verdict in that case? Guilty.

Erlinger suggests that trial courts could avoid putting defendants to the choice between prejudicing the jury and having to forgo a jury trial by bifurcating the trial. Bifurcating entails holding a separate mini-trial with the jury on the recidivism enhancement after the jury has found the defendant guilty of a crime.

But most criminal cases are tried in state court. And States remain free not to bifurcate (as do federal judges, for that matter). Bifurcated trials have been and remain "rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure." *Spencer*, 385 U. S., at 568. Instead, the trial court ordinarily has discretion to decide whether to bifurcate, and bifurcation carries "its own costs." *United States* v. *Durham*, 655 F. Supp. 3d 598, 615 (WD Ky. 2023). In order for overruling *Almendarez-Torres* to help defendants instead of hurting many of them, this Court would have to say as a matter of constitutional law that all 50 States and the federal courts must hold bifurcated trials in recidivism cases. Of course, that would require overruling *Spencer*, 385 U. S., at 568–569. I doubt that the Court would go to that extreme. So if *Almendarez-Torres* were overruled, a defendant who is denied a bifurcated trial could be subject to all of the harm and prejudice that results from telling a jury about the defendant's past crimes.[7]

---

[7] If a State does not provide for bifurcation, a defendant's only path to avoid the prejudice from the prosecutor's parading evidence of the defendant's past crimes before the jury may be to seek the best plea deal possible and plead guilty—hardly a beneficial result for defendants.

KAVANAUGH, J., dissenting

Erlinger also suggests that, to avoid prejudice, defendants can stipulate to the relevant facts about their prior crimes. Brief for Petitioner 41. But that of course makes sense only in cases where the defendant is not disputing the recidivism enhancement. Stipulation is obviously not a solution for those cases where the defendant is contesting his prior convictions and the recidivism enhancement.

In any event, it is true that this Court has interpreted the Federal Rules of Evidence to require the Government to accept a defendant's stipulation that he has a prior conviction. *Old Chief* v. *United States*, 519 U. S. 172, 191–192 (1997). But even under the Federal Rules as interpreted in *Old Chief*, the jury will still hear the stipulation—for example, that the defendant admits that he committed prior felonies.

And to reiterate, most criminal cases are tried in state court. This Court's interpretation of the Federal Rules of Evidence does not require state courts to follow suit when they interpret state rules of evidence. See, *e. g.*, *State* v. *Ball*, 99–0428, p. 5 (La. 11/30/99), 756 So. 2d 275, 278 ("We conclude that *Old Chief* is not controlling and decline to follow it"); *Commonwealth* v. *Jemison*, 626 Pa. 489, 502, 98 A. 3d 1254, 1261–1262 (2014).

Moreover, defendants will suffer that prejudicial harm for little benefit. Determining whether the defendant has a prior conviction for a particular offense will generally yield an obvious answer from the record (or lack thereof) of the prior conviction. Important as the judgment of the jury usually is, I struggle to imagine a jury making a different (or at least a more accurate) finding than a judge on the question of whether a defendant was previously convicted of a crime.[8] As explained above, this case is a prime example.

---

[8] To be clear, in a recidivism proceeding (whether at trial or sentencing), a defendant ordinarily cannot challenge the underlying validity of the prior conviction—for example, by arguing that the prior conviction was infected by error. See *Parke* v. *Raley*, 506 U. S. 20, 29–30 (1992). Chal-

And even if one could stretch the imagination far enough to conceive of a case in which sending the prior-conviction issue to the jury makes a difference and produces a more accurate answer, it would certainly not be a sufficiently frequent occurrence to create a pressing need to overrule precedent.

Nor has *Almendarez-Torres* caused any jurisprudential confusion. Erlinger suggests that the logic of *Apprendi* undermines *Almendarez-Torres*. But *Apprendi* itself reconciled the two cases. In ruling the way that it did on present crimes, *Apprendi* explained at length why *Almendarez-Torres* raised a distinct issue about past crimes.

That line—between the present crime and the past crimes—is clear and has been eminently workable. For sentencing purposes, a judge can find that a defendant was convicted of past crimes, including the who, what, when, and where of those crimes. It is as easy as that. The *Apprendi* rule and *Almendarez-Torres* rule easily co-exist and have for 24 years co-existed as a matter of Sixth Amendment law. See *Apprendi* v. *New Jersey*, 530 U. S. 466, 487–490 (2000).

And today's decision does not alter the basic ease of applying *Almendarez-Torres*. Today's decision, although I disagree with it, is a clear and easily administered carveout from *Almendarez-Torres*.

*Second*, as to reliance, the State and Federal Governments possess substantial reliance interests in their existing sentencing schemes. "Statutes that punish recidivists more severely than first offenders have a long tradition in this country that dates back to colonial times." *Parke*, 506 U. S., at 26. By 1992, all 50 States and the Federal Government had recidivism sentencing enhancements. *Id.*, at 26–27. State judges apply many of those state recidivism sentencing enhancements, as federal judges do in ACCA. See, *e. g.*, N. J.

---

lenges to the underlying validity of a prior conviction typically must be made in the appeal or habeas corpus proceedings regarding that prior conviction.

Stat. Ann. § 2C:44–3(a) (West 2016); 42 Pa. Cons. Stat. § 9714(a)(2) (2019); R. I. Gen. Laws § 12–19–21 (2002).

Overruling *Almendarez-Torres* would upend that settled practice. Legislatures across the country would have to choose among various bad options. They could undermine the longstanding limits on introducing evidence at trial of past crimes. They could jettison longstanding sentencing enhancements for recidivists. They could mandate costly and inefficient bifurcated trials in cases with a recidivism enhancement, a fairly dramatic change to day-to-day criminal trial practice in many jurisdictions. Or they could simply enact discretionary sentencing regimes and authorize sentences within a broad range for most crimes, leaving to judges' discretion the choice within that range. See *Apprendi*, 530 U. S., at 490, n. 16. Any of those options would be a big change—and on top of that, several would actually be unhelpful to criminal defendants.

To what end? There would be little (really nothing) to gain by overruling *Almendarez-Torres* now, after 26 years of settled federal and state practice relying on and easily applying it. It is difficult to conceive of a stronger case for *stare decisis* than a longstanding rule with substantial systemic benefits, ease of application, no apparent downside for criminal defendants, and significant reliance interests. This Court should adhere to *Almendarez-Torres*'s settled rule.

\*     \*     \*

As to the Court's conclusion that a jury must determine whether the defendant's three prior violent felonies were committed on different occasions, I respectfully dissent.

JUSTICE JACKSON, dissenting.

In the Armed Career Criminal Act (ACCA), 18 U. S. C. § 924(e), Congress directed sentencing judges to conduct a "multi-factored" inquiry into "a range of circumstances" to determine whether a particular defendant's criminal history

suggests that he is the sort of "'revolving door' felo[n]" that ACCA was designed to target. *Wooden* v. *United States*, 595 U. S. 360, 369, 375 (2022); see also § 924(e)(1). Those kinds of findings have historically been deemed well within the capacity of a sentencing judge. See *Almendarez-Torres* v. *United States*, 523 U. S. 224, 243–244 (1998). Today, the Court concludes that *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), must be read to suggest otherwise—*i. e.*, that under *Apprendi*, for sentencing purposes, facts that relate to a defendant's prior crimes cannot be determined by judges but instead must be found by juries. I disagree for several reasons, including my overarching view that *Apprendi* was wrongly decided. Like many jurists and other observers before me, I do not believe that Congress exceeds its constitutional authority when it empowers judges to make factual determinations related to punishment and directs that a particular sentencing result follow from such findings.[1]

I recognize, of course, that *Apprendi* is a binding precedent of this Court, and one that "has now defined the relevant legal regime" for nearly a quarter century. *Alleyne* v. *United States*, 570 U. S. 99, 122 (2013) (Breyer, J., concurring in part and concurring in judgment). Given that reality, untangling the knots *Apprendi* has tied is probably infeasible at this point in our Court's jurisprudential journey. But considering the flaws inherent in *Apprendi*'s approach, I cannot join today's effort to further extend *Apprendi*'s holding, particularly when there is a well-established recidivism exception to the *Apprendi* rule that applies to the circumstances of the case before us now.

—————

[1] Critiques of the *Apprendi* Court's misguided constitutional analysis have been covered at length elsewhere. See, *e. g.*, *Apprendi* v. *New Jersey*, 530 U. S. 466, 524–536 (2000) (O'Connor, J., dissenting); *id.*, at 559–561 (Breyer, J., dissenting); *Blakely* v. *Washington*, 542 U. S. 296, 321 (2004) (O'Connor, J., dissenting); *id.*, at 326–327 (Kennedy, J., dissenting); *id.*, at 340–346 (Breyer, J., dissenting); S. Bibas, Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Pleas, 110 Yale L. J. 1097 (2001).

JACKSON, J., dissenting

I agree with JUSTICE KAVANAUGH that, all things considered, the Court errs in concluding today that ACCA's occasions inquiry must be decided by a jury. See *ante*, at 853–858 (dissenting opinion). I write separately to provide an additional critical perspective on the *Apprendi* doctrine—one that is informed by how sentencing has actually worked on the ground, before and after *Apprendi*—and to note that applying the *Apprendi* rule to ACCA's occasions finding creates all sorts of practical problems that are easily avoided by simply allowing judges to do what they have always done. Because the Court pushes the flawed *Apprendi* rule past where it needs to go, and, incidentally, establishes a procedural requirement that is likely impossible to implement in real life, I respectfully dissent.

I

In *Apprendi*, this Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U. S., at 490. For the reasons others have skillfully articulated, see n. 1, *supra*, and also the reasons that follow, I think the *Apprendi* Court was wrong to interpret the Sixth Amendment's jury-trial guarantee to limit legislatures' ability to define crimes and give judges discretion to set appropriate punishments based on findings of fact. *Apprendi* and its ilk have also needlessly hampered Congress's and state legislatures' pursuit of a fairer and more rational sentencing system.

A

Our Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U. S. 358, 364 (1970). At the outset, it is important to take note of the scope of this constitutional protection as it has traditionally been recognized and under-

stood: It is a protection against *conviction* without the necessary facts having been established beyond a reasonable doubt. *Ibid.* That is not the same as a protection against being *sentenced* to a certain level of punishment unless the facts that are relevant to that sentencing determination have been proved to a jury consistent with the reasonable-doubt standard.

The facts that must be proved before a defendant can be convicted are often called elements. See *United States* v. *Gaudin*, 515 U. S. 506, 510 (1995). Traditionally, "the elements of a crime are its requisite (a) conduct (act or omission to act) and (b) mental fault (except for strict liability crimes)—plus, often, (c) specified attendant circumstances, and, sometimes, (d) a specified result of the conduct." 1 W. LaFave, Substantive Criminal Law § 1.8(b), p. 103, n. 14 (3d ed. 2018); see also 1 J. Ohlin, Wharton's Criminal Law § 3:1, pp. 48–49 (16th ed. 2021). As the majority correctly recognizes, such elemental facts have always been in the purview of the jury. See *ante*, at 831. The Sixth Amendment's jury-trial guarantee reflects this well-established understanding of the jury's domain. See *Sullivan* v. *Louisiana*, 508 U. S. 275, 277–278 (1993).

Although sometimes the "determination of what elements constitute a crime . . . is subject to dispute," *Gaudin*, 515 U. S., at 525 (Rehnquist, C. J., concurring), it is clear that "[o]nly the people's elected representatives in the legislature are authorized to 'make an act a crime,'" *United States* v. *Davis*, 588 U. S. 445, 451 (2019) (quoting *United States* v. *Hudson*, 7 Cranch 32, 34 (1812)). It follows that "'[t]he definition of the elements of a criminal offense is entrusted to the legislature.'" *Staples* v. *United States*, 511 U. S. 600, 604 (1994) (quoting *Liparota* v. *United States*, 471 U. S. 419, 424 (1985); alteration in original). For that reason, this Court—at least until recent times—generally deferred to legislative judgments about which facts constitute elements of the offense. See *McMillan* v. *Pennsylvania*, 477 U. S. 79,

85 (1986) ("[I]n determining what facts must be proved beyond a reasonable doubt the . . . legislature's definition of the elements . . . is usually dispositive").

Once a defendant has been found guilty of a crime—*i.e.*, once a jury has made the requisite factual findings establishing the elements of the crime—judges have traditionally been entrusted with substantial discretion to impose the appropriate sentence.   See K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998). Indeed, at the dawn of our Republic, the very first Congress enacted many criminal laws that prescribed a range of possible punishments, leaving it to judges to determine the proper sentence.   See An Act for the Punishment of Certain Crimes Against the United States, ch. 9, 1 Stat. 112–118; see also R. Little & T. Chen, The Lost History of *Apprendi* and the *Blakely* Petition for Rehearing, 17 Fed. Sentencing Rep. 69, 72 (2004).[2]

Significantly for present purposes, judges were thought to "inherently possess ample right to exercise reasonable, that is, judicial, discretion to enable them to wisely exert their authority" in deciding what punishment to impose. *Ex parte United States*, 242 U. S. 27, 41–42 (1916).   In fact, a judge's determination of the appropriate sentence was long considered to be unreviewable in most circumstances.   See *Dorszynski* v. *United States*, 418 U. S. 424, 431 (1974).

When exercising their sentencing authority, judges were also presumed to have the power to find and consider nearly any fact deemed relevant to the penalty.   "[B]oth before and

---

[2] For example, the First Congress declared that misprision (*i.e.*, concealment) of a felony was punishable by "imprison[ment] not exceeding three years" and a "fin[e] not exceeding five hundred dollars."   § 6, 1 Stat. 113. Stealing or falsifying court records was punishable by "imprison[ment] not exceeding seven years" and "whipp[ing] not exceeding thirty-nine stripes."   § 15, *id.*, at 115–116.   At least 14 other federal crimes enacted during this time gave judges discretion over similar sentencing ranges. See Little & Chen, 17 Fed. Sentencing Rep., at 72.

since the American colonies became a nation, courts in this
country and in England practiced a policy under which a sen-
tencing judge could exercise a wide discretion in the sources
and types of evidence used to assist him in determining the
kind and extent of punishment to be imposed within limits
fixed by law." *Williams* v. *New York*, 337 U. S. 241, 246
(1949). A sentencing judge might find, for example, that a
defendant lacked remorse for his crime, or that the conduct
underlying the crime was particularly heinous, and sentence
the defendant accordingly. See *id.*, at 247. All of those
kinds of factual determinations were considered to be impor-
tant factors for imposing the sentence that a person who had
been found guilty of a criminal act would be required to
serve. And none of them were thought to be subject to the
Sixth Amendment's jury-trial right.

By the late 19th century, sentencing schemes grew more
complex, with the vast majority of States and the Federal
Government adopting so-called indeterminate sentencing
systems. A. Campbell, Law of Sentencing §§ 1:2–1:3, pp. 9–
10 (3d ed. 2004) (Campbell). In those jurisdictions, "[u]sing
broad discretion, trial courts imposed minimum and maxi-
mum [sentences] based on judicial estimates of how long it
would take to rehabilitate criminal offenders," which parole
boards then used to determine when an offender would be
released. *Id.*, § 1:3, at 10. There, too, judges were given
wide authority to determine an appropriate sentencing
range, and to do so based on judicial findings of fact. In
fact, "judges were encouraged to weigh the character of the
individual offender along with the nature of the offense when
imposing sentence," *id.*, § 1:2, at 9, considerations that are
immensely factbound. That judges rather that juries made
these factual findings was not thought to be constitutionally
problematic.

Critically, the nature of factfinding proceedings before a
judge at sentencing was—and still is—fundamentally differ-
ent from the factfinding that a jury engages in. Jury fact-

finding at trial "always ha[s] been hedged in by strict evidentiary procedural limitations." *Williams*, 337 U. S., at 246. By contrast, such limitations have not, as a general matter, applied to judges when they find facts for sentencing purposes. See *ibid.* Instead, a sentencing judge has always been expected to consider a wide range of information—really, anything relevant to assessing the appropriate penalty—when determining a sentence.

The difference between jury factfinding at trial and judicial factfinding for sentencing makes perfect sense. "Typically, trial disputes center on particular issues of historical fact," and juries accordingly "receive limited information and must choose from limited options to resolve disputed issues." D. Berman & S. Bibas, Making Sentencing Sensible, 4 Ohio St. J. Crim. L. 37, 54 (2006). As a result, "[r]ules of evidence have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged." *Williams*, 337 U. S., at 246–247. "A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined." *Id.*, at 247. Thus, sentencing judges "receiv[e] a range of information about both the offense and the offender and can choose from various possible dispositions." Berman & Bibas, 4 Ohio St. J. Crim. L., at 55. "Highly relevant—if not essential—to [a judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams*, 337 U. S., at 247.

The upshot is that, traditionally, judges and juries have not only played different factfinding roles, they have also utilized different tools to carry out those duties. And far from being ill equipped to find facts for punishment purposes, judges have long been regarded as having both the power and the institutional competency to determine the factual bases for

the imposition of sentences. Again: This judicial authority has traditionally included the ability to make findings of fact related to both an offender's characteristics and the criminal conduct at issue as necessary to determine an appropriate sentence—all while relying on a wide range of evidence. Historically, none of this was thought to conflict with or usurp the jury's distinct role of determining guilt or innocence.

B

Over time, however, legislatures became concerned with "the almost wholly unchecked and sweeping powers . . . give[n] to judges in the fashioning of sentences." M. Frankel, Criminal Sentences: Law Without Order 5 (1973). "[L]egislators . . . decried the perceived inequity of incarcerating some offenders longer than others for the same crime," as well as the possibility that discriminatory considerations such as race and sex were playing a role in judges' sentencing determinations. Campbell § 1:3, at 11; see also S. Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 4–5 (1988). "The length of time a person spent in prison appeared to depend on 'what the judge ate for breakfast' on the day of sentencing, on which judge you got, or on other factors that should not have made a difference to the length of the sentence." *Blakely* v. *Washington*, 542 U. S. 296, 332 (2004) (Breyer, J., dissenting).

Out of this unregulated environment emerged a legislative development—the identification of what are commonly referred to as "sentencing factors" (also known as "sentencing facts"). In an effort "to bring more order and consistency to the [sentencing] process," Congress and state legislatures "sought to move from a system of indeterminate sentencing or a grant of vast discretion to the trial judge to a regime in which there [were] more uniform penalties, prescribed by the legislature." *Jones* v. *United States*, 526 U. S. 227,

271 (1999) (Kennedy, J., dissenting). Legislatures recognized that, although judges are fully competent to find facts and exercise discretion when sentencing, too much discretion could create unwarranted disparities and therefore have detrimental effects. New sentencing regimes were implemented to cabin sentencing discretion by "directly limit-[ing] the use . . . of particular factors in sentencing" and "by specifying statutorily how a particular factor [would] affect the sentence." *Apprendi*, 530 U. S., at 560 (Breyer, J., dissenting).

Legislatures sometimes specified, for example, "that a particular factor, say, use of a weapon, recidivism, injury to a victim, or bad motive, 'shall' increase, or 'may' increase, a particular sentence in a particular way." *Ibid.* Conversely, legislatures also directed judges to disregard certain facts, including those that were deemed irrelevant for sentencing purposes. See 28 U. S. C. § 994(d) (directing the U. S. Sentencing Commission to consider whether age, education, vocational skills, and other factors are relevant to sentencing); United States Sentencing Commission, Guidelines Manual §§ 5H1.2, 5H1.4, 5H1.5, 5H1.6 (Nov. 2023) (noting that education, drug or alcohol dependence, employment record, and family ties are ordinarily not relevant in determining the length of a sentence); see also, *e. g.*, Wash. Rev. Code § 9.94A.535(e) (2023) (excluding "[v]oluntary use of drugs or alcohol" as a potential mitigating factor).

These structured sentencing schemes were not adopted "to manipulate the statutory elements of criminal offenses or to circumvent the procedural protections of the Bill of Rights." *Blakely*, 542 U. S., at 316 (O'Connor, J., dissenting). Rather, Congress and the States that adopted these rules did so against a backdrop of unbounded judicial discretion that had proved, in their view, to be unwieldy, unfair, and unwise. Accordingly, the goal of legislative efforts in this regard was to constrain judicial discretion by channeling the

accepted competency of judges to set appropriate sentences toward the objective of achieving more consistent and more equitable outcomes.

This Court dealt a significant blow to these legislative attempts to promote fairness and consistency in sentencing with its decision in *Apprendi*. As I previously noted, we concluded—for the first time in history—that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum" is an element that "must be submitted to a jury, and proved beyond a reasonable doubt." 530 U. S., at 490. We later extended that rule to cover any "finding of fact" that "alters the legally prescribed punishment so as to aggravate it," because—in the Court's view—that "fact necessarily forms a constituent part of a new offense and must be submitted to the jury." *Alleyne*, 570 U. S., at 114–115.

By now, the *Apprendi* rule has been applied to a litany of punishments other than incarceration. See *ante*, at 833. Through these cases, the Court has "embrace[d] a universal and seemingly bright-line rule limiting the power of Congress and state legislatures to define criminal offenses and the sentences that follow from convictions thereunder." *Apprendi*, 530 U. S., at 525 (O'Connor, J., dissenting). By any measure, "[t]he impact of *Apprendi* and its progeny has been extraordinary, disrupting sentences and prompting new [corrective] legislation across the nation." 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §26.4(i), p. 1011 (4th ed. 2015).

## II

### A

I was not a Member of the Court during these developments. In my view, however, the Court made a serious mistake when it conflated elements and sentencing factors in this way. As others have argued, "[t]he Court's basic error in *Apprendi* . . . was its failure to recognize the law's tradi-

tional distinction between elements of a crime (facts constituting the crime, typically for the jury to determine) and sentencing facts (facts affecting the sentence, often concerning, *e. g.*, the manner in which the offender committed the crime, and typically for the judge to determine)." *Alleyne*, 570 U. S., at 122 (Breyer, J., concurring in part and concurring in judgment). The Sixth Amendment's jury-trial right "guarantees a jury's determination of facts that constitute the elements of a crime"—no more and no less. *Id.*, at 123.

To be fair, the principal justification that has been given for *Apprendi*'s conflation of elements and sentencing factors is a historical one. See, *e. g.*, *ante*, at 829–830; *Alleyne*, 570 U. S., at 108–111 (opinion of THOMAS, J.). The account that has been provided in some of the Court's opinions is that, during the founding era, " '[o]nce the facts of the offense were determined by the jury, the judge was meant simply to impose the prescribed sentence.' " *Ante*, at 831 (quoting *United States* v. *Haymond*, 588 U. S. 634, 642 (2019) (plurality opinion); alteration in original). But the accuracy of this historical account is debatable. See n. 2, *supra*. Scholars have suggested that, far from the simplistic picture painted by the Court in *Apprendi*, the historical "tradition was not uniform, suggesting that the common law had no fixed rule on the subject." S. Bibas, Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Pleas, 110 Yale L. J. 1097, 1129 (2001); see also, *e. g.*, *id.*, at 1123–1132; Little & Chen, 17 Fed. Sentencing Rep., at 69–70; J. Mitchell, Apprendi's Domain, 2006 S. Ct. Rev. 297, 298–299.

In any event, the Constitution itself does not mention sentencing at all—let alone the work of courts when sentencing—and it certainly "does not freeze 19th-century sentencing practices into permanent law." *Apprendi*, 530 U. S., at 559 (Breyer, J., dissenting). Moreover, "[a]n essential aspect of the Constitution's endurance is that it empowers the political branches to address new challenges by enacting new laws and policies." *Consumer Financial Protection Bureau* v.

*Community Financial Services Assn. of America, Ltd.*, 601
U. S. 416, 446 (2024) (JACKSON, J., concurring).   In my view,
the People's elected representatives should be able to pursue
new and innovative approaches to sentencing and sentencing
reform "without undue interference by courts," *ibid.*, espe-
cially given that unfair and disparate sentences are a persist-
ent societal problem that the legislature is indisputably au-
thorized to address.

Nor is there a functional, policy-based justification for the
constitutional rule that *Apprendi* and its progeny enshrined.
The Court has repeatedly characterized *Apprendi* as pre-
serving "the right of jury trial" in the past, *Blakely*, 542
U. S., at 305, and persists with that mantra to this day, *ante*,
at 829–832.   As the reasoning goes, because the *Apprendi*
rule recognizes that it is "'unconstitutional for a legislature
to remove from the jury the assessment of facts that increase
the prescribed range of penalties to which a criminal defend-
ant is exposed,'" 530 U. S., at 490, *Apprendi* "preserves the
historic role of the jury as an intermediary between the
State and criminal defendants," *Alleyne*, 570 U. S., at 114.

But, in reality, the *Apprendi* rule does no such thing.   A
sentencing judge today remains free, consistent with *Ap-
prendi*, to impose any punishment within a prescribed sen-
tencing range based on whatever facts she deems relevant.
See 530 U. S., at 481 (conceding that judges may "exercise
discretion—taking into consideration various factors relating
both to offense and offender—in imposing a judgment within
the range prescribed" (emphasis deleted)).   So, "[u]nder the
*Apprendi* doctrine, the jury plays only one role with respect
to sentencing, and it is an indirect one: [I]f the defendant
does not plead guilty, then the jury must determine the pres-
ence or absence of the verdict facts that operate to constrain
*the outer limit* of the judge's authority to impose sentence."
B. Priester, *Apprendi* Land Becomes Bizarro World: "Policy
Nullification" and Other Surreal Doctrines in the New Con-
stitutional Law of Sentencing, 51 Santa Clara L. Rev. 1, 47

(2011) (emphasis added). Meanwhile, the judge continues to be the sole decisionmaker with respect to determining the facts she will rely upon to sentence within the typically broad statutory sentencing range. See *United States* v. *Booker*, 543 U. S. 220, 246 (2005). "The jury plays no role in extraverdict factfinding, nor in calculating the specific sentence to be imposed within the outer limit authorized by the verdict facts." Priester, 51 Santa Clara L. Rev., at 48.

*Apprendi*'s distinction between permissible and impermissible judicial factfinding therefore neither aligns with the doctrine's rationale nor achieves its stated goals. As a result, the *Apprendi* rule does little actual work. Even after *Apprendi*, a sentencing judge can still find and consider any fact—including sentencing factors defined by the legislature—so long as the consequence of that fact is not mandatory but rather left to the judge's discretion. And after *Apprendi*, just as before, criminal defendants routinely stipulate to facts that are relevant to statutory maximums and minimums as part of binding plea agreements, making factfinding with respect to these newfound elements irrelevant. So, really, the only change that *Apprendi* has wrought is that legislatures may no longer limit judicial discretion as a matter of law by *requiring* that a particular sentencing fact have a particular effect on the sentence. See *Blakely*, 542 U. S., at 303–304.

At bottom, then, all the *Apprendi* doctrine has done is "shiel[d] the sentencing power of judges from legislative encroachment." Priester, 51 Santa Clara L. Rev., at 49. Given this, it is no wonder that, for all its exhortations about the right to jury factfinding for sentencing purposes, the *Apprendi* line of cases appears to have had no appreciable effect on "the number of criminal jury trials" or on "the number of sentence-affecting facts decided by juries in those trials that do occur." F. Bowman, Debacle: How the Supreme Court Has Mangled American Sentencing Law and How It Might Yet Be Mended, 77 U. Chi. L. Rev. 367, 461 (2010).

B

In terms of the impact on the functioning of our criminal justice system, however, the consequences of the Court's decisions in this area have been palpable. Most notably for present purposes, *Apprendi* has prevented legislatures from developing innovative methods to achieve fairness in sentencing and thus, in my view, has stunted our collective pursuit of justice. What I mean by this is that, while "[l]egislatures may set the available penalties for offenses using verdict facts," they must now be essentially hands off "once that scope of punishment is established." Priester, 51 Santa Clara L. Rev., at 50. Far from the mystical myth that the Sixth Amendment vests juries with sentencing power, the reality is that, through its *Apprendi* doctrine, the Court has merely managed to oust the legislature from its rightful place in the sentencing policy sphere, thereby effectively "insist[ing] that the power to consider sentencing facts and assess their normative worth must rest [solely] with judges." Priester, 51 Santa Clara L. Rev., at 50.

The People's representatives are left with "a binary choice" when crafting legislation due to the *Apprendi* doctrine—"a fact is either of a type that triggers the full panoply of procedural protections that comes with the Sixth Amendment jury trial right, or it is of no constitutional consequence and can be found and relied on by a judge with virtually no procedural safeguards at all." Bowman, 77 U. Chi. L. Rev., at 466; see also *Blakely*, 542 U. S., at 330–340 (Breyer, J., dissenting) (outlining the limited options that legislatures have, all of which "ris[k] either impracticality, unfairness, or harm to the jury trial right"). But not every fact fits neatly into this dichotomy. Moreover, and importantly, judges and juries engage with facts differently in the context of their distinct roles.

"Juries provide democratic legitimacy, common sense, and fresh perspectives." Berman & Bibas, 4 Ohio St. J. Crim. L., at 62. Meanwhile, "[j]udges are experts, can more effec-

tively and consistently apply complex rules, and have flexibility in how they consider evidence." *Id.*, at 62–63. But under the *Apprendi* rule, the policymaking branches of our government can no longer devise more nuanced, creative approaches to factfinding at sentencing that better reflect the differing competencies of jurors and judges.

In short, the Court's all-or-nothing approach to the jury-trial right in *Apprendi* and its kin "pose[s] a serious obstacle to [legislative] efforts to create a sentencing law that would mandate more similar treatment of like offenders, that would thereby diminish sentencing disparity, and that would consequently help to overcome irrational discrimination (including racial discrimination) in sentencing." *Booker*, 543 U. S., at 329 (Breyer, J., dissenting in part). The Court has also "deprive[d] Congress and state legislatures of authority that is constitutionally theirs." *Id.*, at 330.

### C

I recognize that many criminal defendants and their advocates prefer the *Apprendi* regime, which provides some defendants with more procedural protections at sentencing. In no way am I suggesting that the defense bar has "been 'somehow duped' into advocating for a rule that would be 'unfair to criminal defendants.'" *Ante,* at 847 (quoting *Blakely*, 542 U. S., at 312). Defendants' embrace of the *Apprendi* doctrine is perfectly rational because procedural rights like the right to have a jury determine certain sentencing facts "hel[p] some defendants—and probably rais[e] the overall level of defense victories—by giving their lawyers claims and arguments that otherwise would not exist." W. Stuntz, The Uneasy Relationship Between Criminal Procedure and Criminal Justice, 107 Yale L. J. 1, 45 (1997).

In my view, however, the benefit that some criminal defendants derive from the *Apprendi* rule in the context of their individual cases is outweighed by the negative systemic effects that *Apprendi* has wrought, when compared to "the

greater fairness of a sentencing system that a more uniform correspondence between real criminal conduct and real punishment helps to create." *Blakely*, 542 U. S., at 338 (Breyer, J., dissenting). An individual defendant may, of course, benefit from a reduced sentence based on a jury's verdict under the *Apprendi* rule, but that favorable outcome for one person does little to ensure systemic fairness, consistency, and transparency in sentencing. See Stuntz, 107 Yale L. J., at 75.

The U. S. Sentencing Commission has documented the impact of the *Apprendi* rule in the wake of our decision in *United States* v. *Booker*, 543 U. S. 220, which applied *Apprendi* to the Federal Sentencing Guidelines. In *Booker*, we found certain judicial factfinding in the Guidelines context unconstitutional under *Apprendi*, but to remedy that violation, we also held that the Guidelines must be treated as advisory rather than mandatory. 543 U. S., at 244–245. After *Booker*, sentencing disparities of all manner have increased significantly. Otherwise similarly situated defendants appear to receive vastly different sentences depending on the court in which they are prosecuted and what judge is assigned to their case. See, *e. g.*, United States Sentencing Commission, Inter-District Differences in Federal Sentencing Practices 7 (Jan. 2020) ("Variations in sentencing practices across districts increased in the wake of the Supreme Court's 2005 decision in *Booker*"); United States Sentencing Commission, Intra-City Differences in Federal Sentencing Practices 7 (Jan. 2019) ("In most cities, the length of a defendant's sentence increasingly depends on which judge in the courthouse is assigned to his or her case"). Given the history of sentencing reform in our Nation, see Part I–B, *supra*, it was foreseeable that *Apprendi*'s interference with legislative control over judicial sentencing discretion would contribute to these kinds of disparities.

Among the evidence that has been amassed concerning *Apprendi*'s negative downstream impact on sentencing fairness, one statistic is particularly sobering: In the federal

criminal justice system, racial disparities in sentencing have been a persistent problem, but the gap between similarly situated Black and White male defendants "was narrowest" before the Court applied *Apprendi* to the Guidelines. K. Klein & S. Klein, A Racially Biased Obstacle Course: *Apprendi* Transformed the Federal Sentencing Guidelines into a Series of Judicial Obstacles; Can Shame Reduce the Racial Disparities? 99 N. C. L. Rev. 1391, 1412 (2021); see also United States Sentencing Commission, Demographic Differences in Sentencing: An Update to the 2012 *Booker* Report 6 (Nov. 2017). And *Apprendi* appears to have made things appreciably worse. See Klein & Klein, 99 N. C. L. Rev., at 1412 ("Currently, for every fifty-one months a judge gives a White man, a similarly situated Black man receives eight more").

So, while the defense bar might like *Apprendi* because its rule can benefit individual defendants in certain cases, that rule might also be inhibiting our collective achievement of a fairer sentencing system more broadly.

I do acknowledge, however, that there are risks involved with legislative innovation in this area, since not all legislative action in the sentencing realm will be made in pursuit of greater systemic fairness. Legislatures are sometimes incentivized to adopt more punitive measures, such as mandatory minimums or severe recidivism-based sentencing enhancements. See W. Stuntz, The Pathological Politics of Criminal Law, 100 Mich. L. Rev. 505, 530–531 (2001). And at least in some circumstances, the *Apprendi* rule operates to blunt such measures. See *Alleyne*, 570 U. S., at 123–124 (Breyer, J., concurring in part and concurring in judgment). But problems created by the legislature can also be addressed through the democratic process; indeed, legislators have recently retreated from harsh sentencing laws. See, *e. g.*, First Step Act of 2018, Pub. L. 115–391, 132 Stat. 5194; see also *Pulsifer* v. *United States*, 601 U. S. 124, 155 (2024) (GORSUCH, J., dissenting) (discussing the First Step Act's at-

tempt to "recalibrate [Congress's] approach" to sentencing). Meanwhile, *Apprendi*'s constitutional rule operates to constrain legislative reforms while also potentially perpetuating the unfairness caused by unwarranted disparities.

To be clear, my skepticism of *Apprendi* should not be taken to suggest that I believe that legislatures should have unbridled authority to write laws that distinguish between sentencing factors and elements. There is, of course, "a risk of unfairness involved in permitting [legislatures] to make this labeling decision." *Blakely*, 542 U. S., at 344 (Breyer, J., dissenting). Sentencing policymakers could, perhaps, "permit [a sentencing factor] to be a tail which wags the dog of the substantive offense." *McMillan*, 477 U. S., at 88. For example, in the most extreme circumstances, a legislature "might permit a judge to sentence an individual for murder though convicted only of making an illegal lane change." *Blakely*, 542 U. S., at 344 (Breyer, J., dissenting).

But, to me, the most logical solution to that problem is not to invoke the jury-trial right, as the Court has held. "The jury-trial right addresses only *who* makes certain determinations, not *how* these determinations are made." Berman & Bibas, 4 Ohio St. J. Crim. L., at 58–59; see also Bibas, 110 Yale L. J., at 1177–1180. By contrast, "the Due Process Clause is well suited" to address unfair sentencing procedures. *Blakely*, 542 U. S., at 344 (Breyer, J., dissenting); see also *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands"). Other constitutional provisions, like the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments, also play an obvious role in limiting the types of punishments that can be imposed based on sentencing factors. See, *e. g., Ring* v. *Arizona*, 536 U. S. 584, 619 (2002) (Breyer, J., concurring in judgment); *United States* v. *Bajakajian*, 524 U. S. 321, 334–335 (1998).

In other words, to my mind, not every sentencing problem is a nail requiring an *Apprendi* hammer. To the contrary, applying *Apprendi* to address these and other concerns seems to simply erect further roadblocks for policymakers who might otherwise act to promote more fairness in sentencing.

## III

So what do my concerns about *Apprendi* have to do with my analysis of the question presented in this case? The doubts I have make me reluctant to join a ruling that extends *Apprendi*'s holding unnecessarily. And, here, we need not conclude that the occasions finding in ACCA is one to which the *Apprendi* rule applies, as JUSTICE KAVANAUGH explains. *Ante*, at 853–854 (dissenting opinion). Indeed, we have already recognized that "[j]udges may," consistent with the *Apprendi* rule, "resolve questions about a defendant's past crimes . . . that are relevant not to the defendant's guilt for the present offense but rather to the length of the defendant's sentence." *Ante*, at 853–854; see also *Almendarez-Torres*, 523 U. S., at 239, 247.

I will use this opportunity to make one additional observation: Not only is the majority's approach to ACCA's occasions finding inconsistent with our precedent (as JUSTICE KAVANAUGH observes, *ante*, at 853–854), it is also unworkable in practice, due to the limitations inherent in jury presentations. That is, for all the majority's talk of constitutional theory, it gives little thought to "proportionality, uniformity, and administrability," which "are all aspects of that basic 'fairness' that the Constitution demands." *Apprendi*, 530 U. S., at 559 (Breyer, J., dissenting).

As a reminder, ACCA directs sentencing courts to impose a 15-year mandatory minimum for a violation of 18 U. S. C. §922(g) if the defendant has three qualifying prior convictions "committed on occasions different from one another." 18 U. S. C. §924(e)(1). In *Wooden*, we explained

that ACCA's occasions finding is not a simple up-or-down assessment; rather, the factfinder must consider "a range of circumstances," including the timing, location, character, and relationship of the crimes. 595 U. S., at 369. The majority now concludes that, "given the intensely factual nature of this inquiry . . . , a jury must resolve it." *Ante*, at 828. I come to exactly the opposite conclusion, based on the nature of the factfinding that judges and juries engage in—and their relative competencies. In my view, "the intensely factual nature of this inquiry," *ibid.*, when combined with the fact that ACCA's occasions finding often pertains to long-past prior criminal behavior by the defendant, is precisely why a jury is poorly situated to make such a finding, as opposed to a judge. As I explain below, the particular factfinding determination that the occasions inquiry requires is unsuitable for juries to decide in terms of both fairness and efficiency—two crucial criteria for procedural requirements in a criminal justice system.

A

As to fairness, ACCA's occasions determination involves facts about a defendant's past crimes that can prejudice the jury against the defendant and thereby make it more difficult for the jury to find in the defendant's favor with respect to the occasions issue.

Past criminality on a defendant's part "is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence." *Almendarez-Torres*, 523 U. S., at 243. And there is a good reason judges have long been entrusted with finding facts related to recidivism—because "the introduction of evidence of a defendant's prior crimes" to a jury "risks significant prejudice." *Id.*, at 235. This Court has specifically recognized the substantial risk of "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." *Old Chief* v. *United States*, 519 U. S. 172, 180–181 (1997). Empirical research has further confirmed

JACKSON, J., dissenting

the commonsense conclusion that criminal history is prejudicial. See, *e. g.*, T. Eisenberg & V. Hans, Taking a Stand on Taking the Stand: The Effect of a Prior Criminal Record on the Decision To Testify and on Trial Outcomes, 94 Cornell L. Rev. 1353, 1357 (2009) ("Juries appear to rely on criminal records to convict when other evidence in the case normally would not support conviction").

As JUSTICE KAVANAUGH notes, such fairness concerns have long compelled courts to keep facts concerning a defendant's criminal history away from juries. *Ante*, at 866–867. "Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt." *Michelson* v. *United States*, 335 U. S. 469, 475 (1948). This principle—that juries would be prejudiced by exposure to a defendant's criminal history—is, in fact, a cornerstone of criminal procedure.[3]

The majority seems to agree that past-crimes evidence is prejudicial, at least to a certain extent. It says that, when ACCA's occasions inquiry is set for jury determination under the *Apprendi* rule (as we require today), trial courts will need "to address the prejudicial effect evidence about a defendant's past crimes can have on a jury." *Ante*, at 847. In the majority's view, however, the "[m]ost obviou[s]" solution is bifurcating the proceedings between the § 922(g) charge and ACCA's occasions determination. *Ibid.* But bifurcation is not an easy fix, as JUSTICE KAVANAUGH explains.

---

[3] For example, this Court has held that, when a defendant stipulates to the existence of a prior conviction, the prosecution may not introduce evidence of the underlying facts for that conviction. *Old Chief* v. *United States*, 519 U. S. 172, 191 (1997). Similarly, we have recognized that prosecutors may not comment on a defendant's refusal to testify, given that such a refusal may stem from a concern that his prior convictions will be used to impeach him and thus prejudice the jury. See *Griffin* v. *California*, 380 U. S. 609, 615 (1965). The suggestion that juries should now engage in rigorous factfinding with respect to a defendant's criminal history is in tension with these prior pronouncements.

*Ante*, at 868. For one thing, bifurcation of trial proceedings imposes significant additional burdens on the criminal justice system. *Ibid.* I will point to an additional problem: Even bifurcation may not suffice to completely eliminate potential juror prejudice with respect to the occasions finding.

Consider, if you will, the kinds of evidence the prosecution might ask a jury to evaluate in a bifurcated trial over (the comparatively pedestrian) question whether a defendant's prior crimes were committed on different occasions. Also imagine the defendant's potential arguments in response. Concerning the latter, in this case, Erlinger's counsel suggested that his past crimes—three burglaries that occurred on different dates over an 8-day period—could conceivably constitute a single occasion of criminality if those break-ins were all committed "to get money to pay [a] gambling debt." Tr. of Oral Arg. 25. Under *Wooden'*s inquiry, however, any jury making the occasions determination in this case would not be directed just to consider whether Erlinger did, in fact, have a gambling problem—they would also have to determine exactly what happened during each of Erlinger's burglaries.

The jury would be called upon to assess Erlinger's credibility and decide whether they believed his gambling-debt story in light of his criminality, and the potential prejudice from entertaining evidence about all the sordid details of Erlinger's underlying crimes makes a fair credibility finding much more difficult. In other words, Erlinger's past criminal behavior, and the fact that he was previously convicted of these crimes (more than one of them), conclusively establishes that Erlinger is a convicted serial burglar—and perhaps a violent one at that—rendering any credibility finding in the defendant's favor significantly more dubious. See *Shepard* v. *United States*, 544 U. S. 13, 38 (2005) (O'Connor, J., dissenting) (observing that the "prejudice is likely to be especially strong in ACCA cases, where the relevant prior crimes are, by definition, 'violent'"); see also *Michelson*, 335

JACKSON, J., dissenting

U. S., at 476 (observing that prior-crimes evidence can "overpersuade" jurors "to prejudge [a defendant] with a bad general record and deny him a fair opportunity to defend against" the Government's arguments).

To be sure, preventing undue prejudice against defendants is an important responsibility of judges, and it is certainly possible that, with the benefit of careful limiting instructions, jurors would be able to dispassionately consider evidence about the nature and extent of a defendant's past criminality only for the narrow question whether the defendant's past crimes were, in fact, committed on separate occasions. See *Spencer* v. *Texas*, 385 U. S. 554, 562 (1967). But given what *Wooden* calls for, it seems as though some degree of prejudice from the sheer fact of the defendant's having been previously convicted of crimes of this nature is inevitable. See *Krulewitch* v. *United States*, 336 U. S. 440, 453 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction" (citation omitted)).

B

The potential for prejudice is not the only practical problem. At the same time, a jury trial—a highly regulated, inflexible proceeding—is, by its nature, poorly equipped to deal with the fine-grained, nuanced determinations based on sometimes-decades-old evidence that are necessary to fairly adjudicate factual questions like the one that ACCA's occasions inquiry raises. This mismatch, too, persists even in the proposed world of bifurcated trials. Bifurcated trials or no, it is wildly inefficient for our system to try to fit the square peg of factfinding related to past criminality for sentencing purposes into the round hole of the existing processes that govern jury determinations.

As I have explained, factfinding at trial (before a jury) and factfinding at sentencing (before a judge) differ procedurally in fundamental ways. See Part I–A, *supra*. Jury factfind-

ing is restricted and regimented, because a jury trial is
"confine[d] . . . to evidence that is strictly relevant to the
particular offense charged." *Williams*, 337 U. S., at 247.
Meanwhile, because "[a] sentencing judge . . . is not confined
to the narrow issue of guilt," she is not bound by "strict
evidentiary procedural limitations"; rather, when determin-
ing the appropriate sentence, a judge "exercise[s] a wide dis-
cretion in the sources and types of evidence used to assist
[her] in determining the kind and extent of punishment to be
imposed." *Id.*, at 246–247.

Again, ACCA's occasions determination is illustrative.
Recall that *Wooden* requires a nuanced consideration of vari-
ous factors, such as timing, location, and character of the past
crimes, to determine whether those past crimes constituted
separate "episodes of criminal activity." 595 U. S., at 369.
The "strict evidentiary procedural limitations" that apply to
juries, *Williams*, 337 U. S., at 246, make it impractical for
juries to conduct this kind of assessment. To take just one
example, ACCA cases typically involve predicate crimes that
may have occurred years—or even, as here, *decades*—ago.
See *ante*, at 826–827. Erlinger's sentencing for the crime
to which ACCA potentially applies took place in 2022. See
App. to Pet. for Cert. 14a. The three burglaries that gave
rise to the occasions issue occurred 31 years prior—in 1991.
*Id.*, at 21a. Given the rigidity of trials and the frailty of
trial evidence, how—that is, *based on what evidence*—is a
jury supposed to go about making the occasions finding in
this case?

The majority today boldly relegates this particular fact-
finding task to a jury, without pausing to explain how this
assignment will reasonably be accomplished in light of these
practical limitations. "But the real world of criminal justice
. . . can function only with the help of procedural compro-
mises, particularly in respect to sentencing." *Apprendi*, 530
U. S., at 555 (Breyer, J., dissenting). Even setting aside that
a perfectly competent alternative participant in the criminal
justice process (the judge) stands ready to do this (and can

do it quite well, with the flexibility her role affords), I foresee many practical obstacles to jury factfinding concerning this particular recidivism fact, not the least of which is that evidence required to make the occasions determination with any reliability may not be in a form suitable for submission to a jury, or simply may no longer exist.

Issues concerning the state of the evidence with respect to decades-old past crimes could be why, between *Wooden* and now, most sentencing judges have made ACCA's occasions finding based solely on so-called *Shepard* documents, which "include judicial records, plea agreements, and colloquies between a judge and the defendant" from the past criminal proceeding. *Ante*, at 839. In the context of a sentencing hearing, a judge—who, after all, has professional familiarity with these kinds of records—can consider such documents with minimal effort. Judges know how to interpret these sorts of court records. Additionally, during sentencing proceedings, parties' arguments and evidence are not restricted, so based on what the parties find, as well as what evidence still exists, arguments can be made directly to the judge about whether the occasions inquiry is satisfied, including arguments that speak directly to imperfect recordkeeping and any potentially material gaps.

Not so for a jury trial—at least not easily. There is a good reason why lawyers present live witnesses to juries: Showing the cold record documenting an event to a jury has much less value. At a minimum, a jury tasked with making the occasions finding would likely need an explanation of what the *Shepard* documents say, and in this adversarial context, that explanation could probably not be provided by the lawyers on their own—it would most likely have to take the form of witness testimony.

And if we were to authorize juries to go beyond the *Shepard* documents related to past crimes in order to make the occasions finding, that inquiry would probably be even more difficult to conduct reliably. Why? First, because, presumably, the original evidence and witnesses related to a defend-

ant's past crimes would have to be somehow located and
produced, despite the passage of time and potential chain-of-
custody issues.    Then, once we overcome those hurdles, the
rules of evidence would most likely come into play—screen-
ing out potentially probative considerations.    By compari-
son, a sentencing judge can account for imperfections in the
evidentiary records and is permitted to consider all manner
of inadmissible evidence (such as out-of-court affidavits or
hearsay testimony) in order to sentence.    See *Williams*, 337
U. S., at 246.[4]

Also, in terms of the most efficient use of the justice sys-
tem's limited resources, any witnesses could testify in narra-
tive form when appearing before a sentencing judge as a
factfinder, at a hearing designated for this purpose, without
requiring examination by lawyers.    In a jury trial, by con-
trast, such evidence would likely have to satisfy "strict evi-
dentiary procedural limitations," *ibid.*, such as direct, cross,
and redirect examination.    That may prove particularly and
prohibitively cumbersome for the occasions inquiry, which is
one small piece of the larger sentencing puzzle.

All of these practical considerations lead me to believe that
insisting that juries make factual determinations about a
defendant's past criminal behavior—and especially the "in-
tensely factual" one at issue here, *ante*, at 828—is not only
unwise but unworkable.    Again, how will juries of today ac-
tually determine what happened—and why—with respect to
long-forgotten crimes of yesteryear?    Who will testify about
those crimes (who is still around and remembers)?    And

---

[4] Some courts have held that sentencing judges cannot consider any evi-
dence other than *Shepard* documents when undertaking ACCA's occasions
inquiry.    See, *e. g.*, *United States* v. *Elliott*, 703 F. 3d 378, 382 (CA7 2012).
But, in general, those conclusions appear to rest on a misunderstanding of
the scope of a judge's power to find recidivism facts.    As I have explained,
judges have long been able to make factual findings for sentencing pur-
poses by considering all manner of evidence, and they are well equipped
to consider any relevant evidence in making recidivism findings.

where is the physical evidence that was originally used to try those cases now?

These kinds of challenges present one obvious reason that, even as the *Apprendi* Court held that the Constitution prohibits judges from finding facts "that increas[e] the penalty for a crime beyond the prescribed statutory maximum," it also included an express exemption—"[o]ther than the fact of a prior conviction." 530 U. S., at 490. Perhaps the Court saw fit to expressly exclude the fact of a prior conviction from its original holding in *Apprendi* because of the reality that requiring juries to find recidivism facts is simply not doable. See *id.*, at 555 (Breyer, J., dissenting) (emphasizing "the impractical nature" of the *Apprendi* rule).

But, hey, says today's majority, why should unrealistic expectations stop the Court from nonetheless requiring this to be done? Not one to be attentive to practical realities, especially when it believes it has constitutional theory on its side, the majority now plows forward, pushing the *Apprendi* doctrine into the realm of facts related to recidivism, which *Apprendi* had excluded, and which lower courts have nearly uniformly reserved for sentencing judges in the two decades since that opinion issued.

The bottom line is this: Unlike juries, judges have the competency, wherewithal, and flexibility to assess facts related to defendants' past crimes and to handle, in a balanced way, the various practical problems that reliance on that kind of evidence raises. All things considered, then, committing the factfinding exercise related to ACCA's occasions inquiry to judges is by far more efficient, and probably more fair to participants in the justice system overall, than requiring juries to make that finding. For this reason, too, this Court should have continued to allow judges to do what they have always done and what they do best—make factual findings related to a defendant's criminal history, as *Apprendi* seems to permit, through its acceptance of *Almendarez-Torres*.

\*    \*    \*

Judges take into account all kinds of facts about a criminal offense and the defendant when sentencing—they always have, and they always will. Doing so is, in fact, how a judge goes about determining what sentence to impose in a given case. Thus, the notion that it is possible for judges to find facts in order to "lower" but not "increase" a defendant's sentence, *ante*, at 835–836, n. 1 (emphasis deleted), is a theoretical concept that bears no relationship to how sentencing actually works in a courtroom.

This might well be why, in reality, judges have continued to find facts that relate to the penalties they impose on criminal defendants (even facts that they ultimately rely on to give a higher sentence than the defendant may have otherwise received) regardless of this Court's pronouncements purporting to vindicate defendants' constitutional rights by giving juries the responsibility to make those particular factual determinations. Ultimately, then, all the *Apprendi* rule accomplishes on the ground is impeding legislative directives to courts about the exercise of judicial discretion when sentencing—a development that, in my view, does not redound to the benefit of defendants collectively, the criminal justice system, or our democratic society.

In any event, before today, recidivism facts in particular have been specifically reserved for judges to determine; *Apprendi* itself expressly exempted the fact of a prior conviction from the rule it was announcing. I would not extend the *Apprendi* rule to cover this kind of factfinding now, especially since applying *Apprendi* to recidivism facts creates a host of practical problems that pertain to fairness and efficiency. Because the Court applies the *Apprendi* doctrine to recidivism findings when it did not have to do so, and also reaches that conclusion without concern for the myriad practical difficulties that arise from this determination, I respectfully dissent.

Reporter's Note

    The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 879, line 11 from bottom: "and" is replaced with "or"
p. 880, line 9: "of" is replaced with "for"
p. 898, line 8 from bottom: "of" is inserted after "kind"